IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 57,060-01






EX PARTE DANIELLE SIMPSON, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM ANDERSON COUNTY






 Cochran, J., delivered the order for a unanimous court.



ORDER



 Applicant presents thirty-seven allegations, including a claim of mental retardation, in
his original application for habeas corpus relief in this death-penalty capital-murder case. The
trial judge entered findings of fact and conclusions of law and recommended that relief be
denied. We have reviewed the record, and we adopt the trial judge's findings and conclusions. 
Therefore, we deny relief. We also dismiss applicant's "Motion to Consider Additional
Evidence of Mental Retardation" because that supplemental material was improperly and
untimely filed with this Court instead of the convicting court. Article 11.071 (1) does not
authorize piecemeal submission of evidence, nor does it permit the original filing of evidence
with this Court rather than the convicting court. Because the trial judge's written findings were
so thorough and complete, we need discuss only applicant's mental- retardation claim and the
motions applicant filed directly in this Court.

I. Applicant was indicted for the robbery and murder of Geraldine Davidson on January
26, 2000. In November 2002, a jury convicted him of that capital murder and, based upon the
jury's answers to the punishment special issues, the trial judge sentenced applicant to death. 
 

 The evidence at trial showed that the 20-year-old applicant, a member of the Southside
Cryps gang, planned and executed a burglary at the Palestine, Texas, home of Mrs. Davidson,
an 84-year-old widow and retired teacher. He had burglarized Mrs. Davidson's home before,
but this time he enlisted the aid of his sixteen-year-old wife and thirteen-year-old cousin. Mrs.
Davidson returned home during the burglary, so applicant and his cohorts tied her up with duct
tape, put her into the trunk of her car, and then spent the afternoon driving around in her car
buying and smoking formaldehyde-laced marijuana cigars. Later, they picked up applicant's
younger brother and stopped at a Jack-in-the-Box, where applicant sent the others inside to buy
food while he waited, outside surveillance camera range, in Mrs. Davidson's car. After the
foursome ate and smoked more marijuana, applicant drove the car to the Neches River. He and
his younger brother pulled Mrs. Davidson out of the trunk, tied her legs to a cinder block, beat
her with her gardening shovel, kicked her in the head, and finally threw her in the river to
drown. After dropping off his three cohorts, applicant "rented" Mrs. Davidson's car to friends
in return for two rocks of crack cocaine. His friends were later pulled over in Mrs. Davidson's
car, and they told the police about applicant "renting" them the stolen car. Police came to
applicant's house to arrest him but he fled. The officers arrested applicant later that day, after
he and his brother were found hiding in a neighborhood "dope house." Applicant was wearing
Mrs. Davidson's gold wedding ring when he was booked into jail.

 We affirmed applicant's conviction and sentence on direct appeal. (2) Meanwhile, on
December 3, 2002, applicant filed his original writ of habeas corpus with the presiding judge
of the convicting court. (3) Accompanying his writ application were two volumes of material,
including various affidavits, treatise excerpts in support of his mental-retardation claim,
documents from the underlying trial, and published law review and behavioral science articles. 
The State filed its response five months later. On June 23, 2003, after consulting with the
attorneys, the trial judge entered an order that found that there were no factual issues that could
not be resolved by using the trial record and the written writ materials. Thus he decided that
a live evidentiary hearing was unnecessary. He ordered both the State and applicant to file
proposed findings of fact and conclusions of law. On July 14, 2003, applicant filed an
additional affidavit by Dr. Windel Dickerson who, based on a personal examination of applicant
and his review of various other materials, concluded that applicant was mildly mentally
retarded. Two weeks later the trial judge signed an order permitting both the State and
applicant to acquire and file additional educational records for applicant. On that same day, the
trial judge denied applicant's proposed findings of fact and conclusions of law and signed the
State's proposed findings.

 On August 7, 2003, applicant's special-education records were filed with the convicting
court, and, one month later, applicant filed a videotaped statement made by Dr. Dickerson. (4) 
All of these materials were then forwarded to this Court on September 10, 2003. Applicant
has continued to file additional motions in this Court, culminating, on May 19, 2004, with a
"Motion to Consider Additional Evidence of Mental Retardation." Attached to this motion is
a letter from Dr. Dickerson and an accompanying psychological-services test report, again
setting out his opinion that applicant is mentally retarded. 

II.


 Applicant contends that he is mentally retarded and thus, under Atkins v. Virginia, (5) he
is exempt from execution. Here, as in Hall v. State, (6) the convicting court did not hold a live
evidentiary hearing on applicant's post-conviction habeas corpus allegation of mental
retardation. But, also as in Hall, the issue of mental retardation was fully litigated during the
punishment phase of applicant's original capital-murder trial. Although applicant's trial took
place before the Supreme Court decided Atkins, his able trial counsel presciently predicted
the outcome of that case and presented extensive mental-retardation evidence as calling for
a "Yes" answer to the mitigation special issue submitted to the jury. Applicant's habeas writ
relies almost exclusively upon that extensive testimony. Although it is advisable to have an
evidentiary hearing to determine mental-retardation claims raised for the first time in post-Atkins habeas applications, (7) it is not necessary where, as here, the habeas applicant relies
primarily upon trial testimony. In this case, both sides had an opportunity to fully develop the
pertinent facts at trial, and the habeas judge had an opportunity to assess the credibility and
demeanor of the witnesses when he presided over the trial. Although the discrete fact of
mental retardation was not an ultimate issue at the capital-murder trial, the punishment phase
testimony fully developed that contested fact. (8)

 During the punishment phase of applicant's trial, the defense called applicant's father,
mother, and two sisters. Significantly, none of these witnesses-the persons who knew him
best during his youth-testified that they had thought, during his formative years, that applicant
was mentally retarded. (9) Applicant's father remembered that applicant had twice suffered head
injuries as a child, but he did not know whether he suffered any brain injury as a result. He
testified that applicant had had school truancy problems and usually got into trouble alone. 
While applicant's father stated that applicant had a history of seizures, his sister said that she
did not believe that applicant had ever suffered seizures. Applicant's elder sister, a TDCJ-CID
prison guard, said that there was very little good that she could say about him other than the fact
that he attended church. Applicant's mother testified that applicant failed kindergarten and
third grade, that he was sometimes placed in special-education classes, and that he was "very
slow and had a learning disability." He missed a lot of school because he had headaches, felt
bad about himself, and because she could not drive him to school all the time, as she had to
work two jobs. She made him move out of her home about a year before the murder because
he had sexually assaulted her adopted daughter.

 The defense also called a psychologist, a pediatric neurologist, and a psychiatrist to
testify to applicant's mental condition and abilities. Dr. Andrews, the psychologist, testified
that applicant has borderline intellectual functioning. He stated that applicant's academic
knowledge is "low" and that he reads at an early high-school level, and has a fifth-grade spelling
ability and sixth-grade math ability. When applicant was 14 years old, his full-scale IQ score
on the Wechsler Intelligence Scale for Children was 71, and he scored a 72 on the TONI. (10) The
next year he received a 78 full-scale IQ score on the Wechsler and an 86 on the TONI-2. No
one discussed the significance of this improvement in IQ scores.

 Applicant dropped out of school in the ninth grade. His teachers consistently noted his
high truancy rate as an educational impediment. Dr. Andrews stated that applicant has adaptive
deficits and a low ability to complete planning and organization tests. He did not believe that
applicant was faking mental deficiencies, but he did think that applicant is "a chronic liar" and
that his manipulative conduct in jail demonstrated adaptive behavior. (11) Dr. Andrews concluded
that applicant is in the "borderline mentally retarded range" and would not resolve complex
situations very well. (12) Dr. Andrews also stated that applicant has an anti-social personality.

 Dr. Wise, a pediatric neurologist, reviewed applicant's EEG (electroencephalogram)
and testified that applicant has an abnormal neurological status, a generalized slowing of brain
function. He stated that the brain changes as a person ages and is influenced by such things as
diet, smoking, drug use, and trauma. He had not personally examined applicant. 

 Dr. Barry Mills, the chief psychiatrist for the Maximum Security Behavior Management
Program at Vernon State Hospital, examined applicant and concluded that applicant has two
subdural hematomas (blood clots on both sides of his brain) which have caused brain damage. 
As a result, applicant has poor judgment, an inability to learn from his mistakes or to change
his actions in response to complicated situations, and an inability to control frustration or
manage himself. Dr. Mills acknowledged that there is nothing in applicant's medical records
to confirm any head injury. He did agree that smoking embalming fluid may cause EEG
changes. Dr. Mills stated that applicant was not malingering during his examination but that
he had been "manipulative and dishonest throughout a large part of his life." He testified that
"I did not say [applicant] was mentally retarded. I said he was borderline mentally retarded,
essentially functioning at that level, but his I.Q. score was not mentally retarded." He agreed
that applicant had never been diagnosed by anyone as "borderline mentally retarded" until after
he was charged with capital murder, and he stated that applicant's TONI IQ of 86 was "a more
accurate measure of [applicant's] intelligence." 

 In rebuttal, the State called Dr. David Self, a psychiatrist, who had also examined
applicant. In his opinion, applicant was malingering and faking his psychiatric symptoms. He
stated that, during his interview, applicant spontaneously launched into a narrative of various
mental complaints, including visual and auditory hallucinations, depression, an attempted
suicide, and a history of head trauma. In Dr. Self's opinion, applicant's intellectual functioning
is in the borderline-to-low average range and he does not have significant adaptive deficits. Dr.
Self described applicant's letter-writing campaign from jail to various friends and relatives
asking them to smuggle contraband to him as adaptive, albeit anti-social, behavior. In his
opinion applicant's lack of empathy, his callous disregard for others, and his prior conduct,
including his sexual assault of his adopted sister, his shooting at his ex-girlfriend, and his
assaults on his wife and children, were traits consistent with a psychopathy. Dr. Self stated that
applicant's MRI showed evidence of a prior "head trauma," but no evidence of any brain
damage. He concluded that applicant has an anti-social personality disorder, but is not
mentally retarded. 

 Additional evidence was timely submitted for the convicting court's consideration on
the writ. This evidence included most of applicant's school records, his two written statements
to police after his arrest for this murder, twenty inmate-request forms that applicant submitted
while he was in jail awaiting trial, letters that he wrote to family and friends from jail, a letter
that he had written from jail to a venireperson whose name and address he had memorized in
the courtroom from his attorney's jury list, and applicant's medical and mental-health records
from TDCJ-CID. 

 Applicant's school records showed that, in almost every year, he missed a large number
of school days, but nonetheless he achieved passing grades in almost all classes. Seventeen
"Notices of Concern" were sent to his family during one school year; they noted that applicant
failed to complete assignments, failed to make up missed tests, and that he exhibited
"excessive absences" and "lack of effort." 

 Applicant's jail letters are clear, coherent, and clever. In one, he explains to his cousin
how to smuggle photographs of his three girlfriends into the jail by taping them to extra pages
in an incoming letter. In letters to his brother, applicant writes jocularly in gang slang. In
letters to his mother, on the other hand, applicant writes in standard English, without slang. He
uses a polite tone as he instructs her on how to smuggle tobacco and rolling papers into the jail
by putting them in envelopes labeled "Legal Mail," and having them delivered by his defense
investigator. He tells his mother that he is working on getting joint custody of his son for her
and his wife's mother, and asks her to call the defense investigator and have him bring applicant
a small tape recorder so he can record his wife's custody concessions on the phone. 

 Applicant's TDCJ-CID medical and mental-health records show that applicant achieved
an IQ result of 84 on a TONI test when he arrived on death row which, according to the records,
"precluded other need for I.Q. testing."

 The trial judge entered findings of fact, based on his review of the trial and writ
evidence, that applicant failed to present a cognizable claim of mental retardation because he
failed to show facts that prove he is mentally retarded. The trial judge found that Dr.
Dickerson's affidavit concluding that applicant is mentally retarded was untimely submitted
and therefore should not be considered. In the alternative, he found it unpersuasive. (13) 

 Although the trial court did not have the benefit of this Court's opinion in Ex parte
Briseno, (14) it followed the methodology and legal standards set out in that opinion. Applicant
claims that his execution would violate the Supreme Court's rulings in Atkins and Ring v.
Arizona (15) unless a jury has found, beyond a reasonable doubt, that he is not mentally retarded,
brain damaged, or otherwise lacking in mental culpability. This is a claim that we rejected in
Briseno, (16) and it is a claim that the habeas judge in this case rejected as well. 

 In sum, although there was some evidence in the trial and writ record suggesting the
possibility of mild mental retardation, there was also ample evidence in the record supporting
the trial court's finding that applicant is not mentally retarded. We conclude that the trial court
did not abuse its discretion in reaching this factual conclusion. Therefore, we deny applicant
relief on his mental retardation claim.

 

III.


 We also dismiss applicant's recently filed "Motion to Consider Additional Evidence
of Mental Retardation" because we do not have statutory authority to consider additional
evidence. 

 Applicant's writ application, the State's response, all associated exhibits, and the trial
court's written findings of fact and conclusions of law were received by this Court on
September 10, 2003. Article 11.071, § 9(f) explicitly states that once all of the appropriate
materials have been timely submitted to the trial court and the trial court has made its written
findings of fact and conclusions of law, the clerk of the convicting court shall immediately
transmit these materials to this Court. Then, under article 11.071, § 11, this Court shall
"expeditiously review" the habeas application. We may (but need not) set the case for oral
argument and we may (but need not) request further briefing. (17) "After reviewing the record"
as it was developed in the trial court, this Court "shall enter its judgment remanding the
applicant to custody or ordering the applicant's release, as the law and facts may justify." (18)

 In the present case, applicant asks us to act outside of our statutory authority. On
November 24, 2003, more than a month after the clerk of the trial court transmitted all of the
appropriate writ materials to this Court, applicant filed a motion with this Court entitled
"Motion to Declare Simpson Mentally Retarded under Atkins or Alternatively, Motion to
Remand for Evidentiary Hearing to Determine Mental Retardation." This motion alleged that
applicant's counsel was "trying to set up an appointment with Dr. Dickerson to re-examine Mr.
Simpson." (19) He requested that this Court stay further action until Dr. Dickerson could file a
new report directly with this Court.

 On February 9, 2004, this Court received applicant's "Supplemental Reply to State's
Response to Petitioner's Mental Retardation Summary." This document stated that Dr.
Dickerson had completed his second examination of applicant and a preliminary report was
attached. Although the document was filed with this Court, applicant asked that the habeas
judge read the attached preliminary report and make supplemental findings. We do not know
whether the habeas judge received and read this document, but he did not file any supplemental
findings, presumably because he did not have statutory authority to do so.

 Finally, on May 19, 2004, applicant filed his Motion to Consider Additional Evidence
of Mental Retardation. He states that this motion is a supplement to the motion he filed with
this Court on November 24, 2003. According to that motion and Dr. Dickerson's attached
report, the results of this second mental-status test were obtained under better conditions than
those under which earlier tests were taken. Dr. Dickerson again opines that applicant is mildly
mentally retarded and suffers from organic brain damage. 

 There is no provision in article 11.071 that permits either the State or the habeas
applicant to submit original evidence directly to this Court. Evidentiary affidavits, letters,
transcripts, or other documents relating to a habeas claim should not be attached to motions
or briefs, and they shall not, and will not, be considered by this Court. As we recently stated
in another context: 

 An appellate court may not consider factual assertions that are outside the
record, and a party cannot circumvent this prohibition by submitting an affidavit
for the first time on appeal. While the record may be supplemented under the
appellate rules if something has been omitted, the supplementation rules cannot
be used to create new evidence. Moreover, an appellate court's review of the
record itself is generally limited to the evidence before the trial court at the
time of the trial court's ruling. (20)


 In the ordinary case, if this Court were to consider evidentiary materials that were never
submitted to, or considered by, the habeas court, the statutory purpose in having the
convicting court gather the pertinent evidence and make the appropriate written findings of fact 
would be entirely frustrated. (21) The legislative framework of article 11.071 contemplates that
the habeas judge is "Johnny-on-the-Spot." He is the collector of the evidence, the organizer
of the materials, the decisionmaker as to what live testimony may be necessary, the factfinder
who resolves disputed factual issues, the judge who applies the law to the facts, enters specific
findings of fact and conclusions of law, and may make a specific recommendation to grant or
deny relief. This Court then has the statutory duty to review the trial court's factual findings
and legal conclusions to ensure that they are supported by the record and are in accordance
with the law. (22) We are not the convicting trial court, and we are not the original factfinders. 
It is generally fruitless, if not counterproductive, to file original evidentiary materials relating
to a habeas claim with this Court rather than the trial court. Although we might have the
implicit authority to consider evidentiary materials filed directly with this Court, normally the
jurisprudential considerations of efficiency, effectiveness, and comity to the habeas court
counsel against such consideration. Because applicant has failed to offer proof of any
compelling and extraordinary circumstances, we decline to consider the evidentiary materials
that he has filed directly with this Court.

 Therefore, based upon our review and our adoption of the trial court's ninety-five pages
of thorough and comprehensive findings of fact and conclusions of law which were submitted
to this Court, we deny relief and dismiss applicant's motions filed directly in this Court.

Cochran

Filed: June 30, 2004.

Publish 
1. Tex. Code Crim. Proc. art. 11.071.
2. Simpson v. State, 119 S.W.3d 262 (Tex. Crim. App. 2003).
3. In his writ application, applicant candidly admits that his claims 20-37 are ones that have been
previously rejected by this Court and "are therefore segregated at the end of the application and need
not delay the Court." Nonetheless, we have carefully reviewed those claims, as well as all of his other
non-mental retardation claims, and deny them based upon the trial court's findings of fact and
conclusions of law.
4. Applicant submitted these materials to the trial court after that court had filed its findings of
fact and conclusions of law and thus they are not discussed within the trial court's written findings. 
Nonetheless, we have independently reviewed the materials and conclude that they do not present any
significant additional information that was not already before the trial court at the time he made his
findings. 
5. 536 U.S. 304 (2002).
6. ___ S.W.3d ___, ___ 2004 Tex.Crim.App. LEXIS 817 (Tex. Crim. App. 2004).
7. See Hall, __ S.W.3d at ___ (Price, J., concurring) (noting that "generally, for the review of a
contested Atkins v. Virginia claim, the trial court will need to hold a live hearing and not base its
decision solely on affidavits submitted by the parties"); id. at ___, (Johnson, J., dissenting) (noting that
"[n]o trier of fact in this case has ever heard live testimony, subject to testing or cross-examination, on
the specific issue of whether appellant is mentally retarded"); and id. at __ (Holcomb, J., dissenting)
(noting that capital murder defendant "was not provided with a live evidentiary hearing ... [and] was not
able to cross examine the affiants and the judge was not able to evaluate their credibility").
8. See Hall, ___ S.W.3d at ___. In Hall, as in the present case, mental retardation was not an
ultimate discrete fact litigated during the capital-murder punishment phase. We noted that:

 the parties introduced a significant amount of evidence regarding whether appellant was
mentally retarded, mental retardation was not considered as a discrete issue by the trial
judge or the jury. Although the parties certainly had incentive to litigate the question of
appellant's intelligence, the litigation occurred as a question of degree: defense counsel
could contend that appellant's low intelligence mitigated his moral culpability even if it
did not amount to mental retardation, while the State could contend that, even if
appellant were in the mental retardation range, he appreciated the consequences of his
actions to a sufficient degree to deserve the death penalty. Had mental retardation been
an ultimate issue, the parties may well have litigated the issue even more robustly than
they did, as the issue would be a question of kind (which side of the mental divide
appellant was on) rather than degree (how much did appellant appreciate the
immorality of his conduct).

Id. Nonetheless, during this writ proceeding, both parties could, and did, present whatever additional
evidence they believed supported or negated the fact of mental retardation. It was only after consulting
with the attorneys that the trial judge determined that a live evidentiary hearing was not necessary.
9. LaTonya, one of applicant's sisters, did testify that applicant was twice held back in
elementary school and "had a bunch of problems." She testified that he missed a lot of school: "I'm
not saying he was retarded, but I'm just saying that he was slow." Applicant's other sister, Tangela,
testified that applicant was slow "as far as educational level," but not in other things.
10. Test of Non-Verbal Intelligence.
11. Dr. Andrews agreed that applicant's conduct in writing his mother-in-law from jail saying that
he would serve his time for this capital murder in a mental hospital by telling "my lawyer and the judge
that I need some help and I'm having problems and seeing things and hearing things" was goal-directed
and showed a knowledge of the legal system and how to avoid the death penalty. Dr. Andrews stated
that he did not believe applicant when applicant told him he had auditory and visual hallucinations. 
Applicant also told Dr. Andrews that he had been hospitalized for psychiatric problems, but Dr.
Andrews could not find corroboration for this assertion. 
12. Concerning the issue of "significant adaptive deficits," Dr. Andrews explained:

 Well, he was not able to function well in school. He was not able to function well in a
work setting. These could be adaptive deficits. They might be problems with
personality as well. I am not terming him mentally retarded but I do think he has some
adaptive deficits.

He noted that applicant had been diagnosed with a learning disability, not mental retardation, by school
officials based upon his IQ test of 78 and TONI results of 86.
13. Specifically, he found that the prison testing conditions "likely affected" the test scores; the IQ
score of 59 that Dr. Dickerson reached was completely at odds with all prior test scores; only portions
of tests were given; separate tests for malingering were not given; Dr. Dickerson's assertion that
applicant was treated as a mentally retarded person in school was contrary to all other evidence which
indicated applicant had a learning disability and truancy problem; Dr. Dickerson appeared not to have
reviewed all of the trial testimony; his "adaptive behavior" assessment did not describe behavior that is
necessarily the result of mental retardation; Dr. Dickerson's assessment was based largely upon
applicant's self-reporting, but applicant's veracity to mental-health experts had been called into serious
question by other experts. Dr. Dickerson's videotaped interview, which was submitted to the trial
court after the written findings were signed, does not differ substantively from his affidavit.
14. Ex parte Briseno, ___ S.W.3d ___ , 2004 Tex. Crim. App. LEXIS 199 (Tex. Crim. App.
2004).
15. 536 U.S. 584 (2002) (holding that "if a State makes an increase in a defendant's authorized
punishment contingent on the finding of a fact, that fact-no matter how the State labels it-must be found
by a jury beyond a reasonable doubt"). 
16. Ex parte Briseno, ___ S.W.3d at __ (concluding that Ring is inapplicable to claims of
mental retardation because "[a] lack of mental retardation is not an implied element of the crime of
capital murder which the State is required to prove before it may impose a sentence above the
maximum statutory punishment for that crime").
17. Tex. Code Crim. Proc. art. 11.071, § 11.
18. Id.
19. Ostensibly, applicant's counsel wanted this re-examination because the trial judge discounted
Dr. Dickerson's first untimely filed affidavit for the various reasons set out earlier.
20. Whitehead v. State, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004). Cf. Ex parte Harris,
825 S.W.2d 120 (Tex. Crim. App. 1991) (noting that Penry claims are limited to evidence contained
in the record. "Evidence outside of the record is wholly irrelevant to such claim"); and Pye v. State, 71
Tex. Crim. 94, 101, 154 S.W. 222, 226 (1913) ("Should we consider these ex parte affidavits it would
be necessary that we have the State served with a copy of them, and permit it to introduce evidence in
rebuttal thereof; in fact, reopen the case and convert this court into a trial court on the merits of the
case, and then substitute our finding on the facts as thus presented to us for that of the verdict of the
jury. This we are not authorized to do. If such was the rule, very nearly every case that was appealed to
this court would have to be tried de novo. This would be wholly impracticable, and it was never
contemplated that this court should become a trial court").
21. See Pye, 71 Tex. Crim. at 101, 154 S.W. at 226.
22. See Hall, ___ S.W.3d at ___ (stating, in context of mental retardation claim raised in habeas
application, that "we afford almost total deference to the trial judge's findings of fact, especially when
those findings of fact are based upon credibility and demeanor").