Danielle SIMPSON, Appellant,

v.

The STATE of Texas.

No. 74029.

Court of Criminal Appeals of Texas.

Oct. 1, 2003.

Jeff Doran, Palestine, for Appellant.

David E. Cervantes, Assist. DA, Palestine, Matthew Paul, State's Attorney, Austin, for the State.

## OPINION

PRICE, J., delivered the opinion of the Court, in which MEYERS, WOMACK, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, J.J., joined.

The appellant was convicted in December 2000 of capital murder. Tex. Penal Code § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071 sections 2(b) and 2(e), the trial judge sentenced the appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this

---

1. Unless otherwise indicated all future references to Articles refer to the Texas Code of Criminal Procedure.

Court is automatic. Art. 37.071 § 2(h). The appellant raises twelve points of error. We shall affirm.

In his first point of error, the appellant claims the trial court erred in sustaining the State's challenge for cause against venire member Brenda S. Looney without allowing the appellant's counsel an opportunity to question her. The trial court conducted Looney's voir dire and devoted its questioning almost exclusively to the issue of her ability to follow the law in light of her personal views about the death penalty. The State challenged her for cause on the ground that she opposed the death penalty, and its challenge was granted. The appellant objected to the granting of the challenge without being given an opportunity to question Looney. On appeal, the appellant relies on *Perillo v. State*, 656 S.W.2d 78 (Tex.Crim.App.1983), for his claim that his counsel should have been allowed to question Looney and he relies on *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), and *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), in support of his argument that the error is not subject to a harm analysis.

In *Perillo*, also a death penalty case, this Court squarely addressed whether the trial court erred in refusing to allow defense counsel the opportunity to question a venire member, and, if so, whether it was reversible error. *Perillo*, 656 S.W.2d at 79. After noting that under Article 35.17 both parties are expressly entitled, on demand, to examine venire members individually, we held that excusing a venire member without allowing defense counsel an opportunity to question him was error.

But whether such error was harmful, and thus reversible, depended upon whether the prospective juror was shown to be disqualified under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[2] In other words,

> Excusing a prospective juror without giving counsel for the defendant an opportunity to question the juror should not ever occur unless the record affirmatively and unequivocally reflects that the prospective juror would, regardless of the evidence, automatically vote for a verdict that would prohibit the assessment of the death penalty.

*Id.* at 81. Because the prospective juror at issue in *Perillo* was a vacillating juror rather than one absolutely disqualified under *Witherspoon*, we held defense counsel should have been given an opportunity to examine him. *Id.* at 82. By failing to give defense counsel such an opportunity, we held the trial court committed reversible error. *Ibid.*

In *Howard v. State*, 941 S.W.2d 102 (Tex.Crim.App.1996), we modified the holding in *Perillo*. We explained that, in prior cases, we had held that it was error for the trial court to refuse a defendant's request to question venire members before they were excused for cause. *Id.* at 113.[3] We noted that, in those cases, we would find the error harmless if, at the time the venire member was excused, the venire member made it absolutely clear that her views on the death penalty would prevent or substantially impair her ability to comply with her oath. *Ibid.*

In *Howard*, we were persuaded that our earlier approach was incorrect, and we modified it. We held that, if after inquiry

---

2. After we decided *Perillo*, the standard set forth in *Witherspoon* was clarified and reiterated by the Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

3. *See, e.g., Felder v. State*, 848 S.W.2d 85, 91 (Tex.Crim.App.1992); *Drinkard v. State*, 776 S.W.2d 181, 184 (Tex.Crim.App.1989).

by the trial court, it is clear that the venire member is conclusively biased against a phase of law upon which the State is entitled to rely during the guilt or punishment phases and that these views would prevent or substantially impair the venire member's ability to perform her duties, it was not error for the trial court to deny the defendant an opportunity to question venire members before granting the State's challenge for cause. *Ibid.*

■ Today, we once again modify the standard for determining error when the trial court denies a defendant's request to question individually a venire member in a capital case. First, Article 35.17, Section 2, is the basis for the appellant's objection that he was not provided an opportunity to question the venire member about her views on the death penalty. That section provides that:

> In a capital felony case in which the State seeks the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

Tex.Code Crim. Proc. art. 35.17, § 2. Although the trial court has a great deal of discretion in placing reasonable restrictions on the exercise of voir dire examination, *Boyd v. State,* 811 S.W.2d 105, 115 (Tex.Crim.App.1991), the statute is clear. The trial court, upon demand of either party, is required to permit that party to

individually question a venire member on the principles already discussed by the trial court. As a result, a trial court that denies a party's request has erred.

The notion of "reversible error" in terms of error that is not subject to a harm analysis has been greatly impacted by our decision in *Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997), when we recognized that "[e]xcept for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis." Both *Perillo* and *Howard* predate our decision in *Cain. Perillo* essentially held that when defense counsel was denied an opportunity to question a venire member who was vacillating under *Witherspoon,*[4] there was *per se* reversible error.

■ In light of *Cain,* such error is now subject to a harm analysis. And, because the appellant's complaint is that he was not afforded an opportunity to question the venire member under Article 35.17, we review the record for harm under the nonconstitutional standard provided in Rule 44.2(b). Under Rule 44.2(b), we disregard all nonconstitutional errors that do not affect the appellant's substantial rights. We have held that a substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Johnson v. State,* 43 S.W.3d 1, 4 (Tex.Crim.App.2001).

■ In this case, the trial court explained the special issues to the venire member. After the explanation, the trial court began to question the venire member

---

**4.** *See also Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), for articulation of standard applicable now.

about her views on the death penalty. At first, the venire member said that she could answer the special issues according to the evidence even if it meant that the trial court would impose a death sentence. Then the trial court questioned the venire member about the questionnaire she had completed. In the questionnaire, the venire member said that she was opposed to the death penalty because she could not put anyone to death. The venire member vacillated on whether she could impose the death penalty until the trial court asked her about her questionnaire response that the death penalty may be appropriate in certain cases, but that she could never return a verdict that would require the trial court to impose a death sentence. When asked about this, she said that her personal feelings would override any evidence that was presented during the trial and that she could never return a verdict of death. She also explained that she holds religious beliefs against the death penalty.

Given the venire member's testimony, it is highly unlikely that the appellant would have been able to convince her to say otherwise or that the trial court would have abused its discretion in dismissing her for cause. As a result, we have a fair assurance that the trial court's error did not influence the outcome of the trial. Point of error one is overruled.

■ In points of error two through seven, the appellant claims the trial court erred in sustaining the State's challenges for cause against six different venire members on the basis of their purported inability to impose the death penalty. The appellant did not preserve error on any of these points because he failed to object when the trial court sustained the State's challenges for cause. Tex.R.App. Proc. 33.1. Points of error two through seven are overruled.

■ In point of error eight, the appellant claims the trial court erred in overruling his *Batson* challenge. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). During voir dire, the appellant objected on *Batson* grounds to the State's use of a peremptory strike against venire member John Willis Earl. Without making a finding that the appellant had made a *prima facie* case, the trial court entertained the State's explanations for its strike against Earl.

The prosecutor explained that Earl was struck for the following reasons: (1) Earl had a nephew who was an inmate in the Texas Department of Criminal Justice, Institutional Division ("TDCJ–ID"); (2) Earl had been an employee of TDCJ–ID from 1977–1978; (3) during his employment with TDCJ–ID, Earl worked with inmates convicted of murder, some of whom he said may be innocent; (4) Earl believed African–Americans receive the death penalty "disproportionately more than other races or groups"; (5) Earl believed death row inmate Gary Graham was unjustly convicted and treated unfairly and strongly believed that the governor should have granted Graham a stay of execution; and (6) a juror consultant who reviewed Earl's questionnaire and voir dire responses suggested he should be struck.

On cross-examination, the appellant asked the prosecutor if any of the other venire members who had worked at TDCJ–ID had been challenged. The prosecutor replied that he did not know. The appellant asked the prosecutor whether there were other venire members besides Earl who were struck by the prosecution because they had known people in prison or had relatives in prison. The prosecutor responded that it was his recollection that there were others and that they had been struck. He named one venire member who was struck because her daughter's

boyfriend was in prison. He also named another venire member who was initially going to be struck because he had several friends in prison, but upon gaining insight into the defense strikes, the prosecution decided against striking him. The prosecutor stated that a third potential juror's involvement in a drug rehabilitation program was a "large consideration" in their decision to use a strike against her. A fourth potential juror's friendship with a man in an Oklahoma prison was a consideration in striking him. There was no further cross-examination. The trial court found the prosecutor's explanations were "clear, ... specific, ... supported by the record, ... ha[d] facial validity," and were race-neutral, and overruled the appellant's *Batson* challenge. The appellant claims the prosecutor's explanations were pretextual.

A *Batson* challenge generally gives rise to a three-step process. First, the defendant must make a *prima facie* case that a venire member was peremptorily excluded on the basis of race. *Jasper v. State*, 61 S.W.3d 413, 421 (Tex.Crim. App.2001). Next, the prosecution must come forward with race-neutral reasons for the peremptory strike. Finally, the defendant has the opportunity to rebut the State's explanations. The burden of persuasion remains with the defendant to prove purposeful discrimination. *Ibid.; see also Johnson v. State*, 68 S.W.3d 644, 649 (Tex.Crim.App.2002). If, as here, the State offers a race-neutral explanation before any inquiry on the *prima facie* case, the issue of a *prima facie* case is moot. *Johnson*, 68 S.W.3d at 649.

In *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the Supreme Court explained that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *See*

*also Guzman v. State*, 85 S.W.3d 242, 246 (Tex.Crim.App.2002). None of the prosecutor's explanations reflect an inherently discriminatory intent. And the appellant did not attempt to rebut the State's reasons. The trial court's finding that the State's explanations were race-neutral is supported by the record and is not clearly erroneous. Point of error eight is overruled.

In his ninth point of error, the appellant claims the trial court erred in permitting the prosecutors to argue a comparison between the appellant and the victim at the guilt phase of trial. In his tenth point of error, the appellant claims the trial court erred in permitting the prosecutors to give their personal opinions in the jury argument. The appellant did not object to any of the complained-of jury arguments and therefore forfeited his right to raise any alleged error on appeal. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996)(defendant must object and pursue objection to adverse ruling in order to complain about erroneous jury argument on appeal). Points of error nine and ten are overruled.

In his eleventh point of error, the appellant claims the trial court erred in admitting hearsay statements of the appellant's wife, Jennifer Simpson, on grounds that they were inadmissible under the Sixth Amendment and the Confrontation Clause. During the guilt phase of the trial, Christina Walker testified that Jennifer told her that "Lionelle had tied the woman and [the appellant] had threw [sic] her in there ... the river." Another witness, Kenosha Walker, testified that Jennifer Simpson told her that "[t]hey went to the Neches River and that [the appellant] and Lionelle got the woman out of the trunk and Lionelle tied a rock to her ankles[.]" The trial court admitted both

statements as statements against interest under Rule of Evidence 803(24).

■ Rule of Evidence 803(24) provides for an exception to the hearsay rule for statements against the declarant's interest. It does not provide an exception for a declarant's statements against someone else's interest, such as a third party, co-actor, or co-defendant, unless the statement against the other person's interest is also sufficiently against the declarant's interest to be considered reliable. *Guidry v. State*, 9 S.W.3d 133, 149 (Tex.Crim.App. 1999). In the statements at issue here, Jennifer, as the declarant, did not implicate herself at all except to suggest her presence by saying that "they" went to the river. This is not enough to render the statements sufficiently against her interest to be reliable. Therefore, the statements made by Jennifer that were against the appellant's interest were not admissible under Rule 803(24).

■ The appellant claims admission of the statements violated the Confrontation Clause of the Sixth Amendment. Admission of hearsay evidence against a criminal defendant implicates the Confrontation Clause because the defendant is not afforded an opportunity to confront the out-of-court declarant. *Ibid.* (citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)).

■ Even if a hearsay statement meets the requirements for an exception to the general prohibition, it must also bear sufficient "indicia of reliability" for it to be admissible under the Confrontation Clause. A statement is *per se* reliable if it falls within a "firmly rooted" exception to the hearsay rule. Even if a statement does not fall within a firmly rooted excep-

tion to the hearsay rule, it may still be sufficiently reliable for Confrontation Clause purposes if it has "particularized guarantees of trustworthiness." *Id.* at 150. It is unlikely the statements at issue in this case possessed the particularized guarantees of trustworthiness sufficient to overcome Confrontation Clause concerns. But we need not decide the issue of the statements' admissibility under the Confrontation Clause because any error in the admission of the statements did not contribute to the appellant's conviction.[5] Tex. R.App. Proc. 44.2(a). Under Rule of Appellate Procedure 44.2(a), we review the entire record and reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. We will review the evidence admitted during the guilt phase of the trial.

The appellant was charged with the offense of capital murder committed in the course of committing or attempting to commit kidnapping. The evidence admitted during the guilt phase of the trial established that there were three parties to the victim's initial kidnapping: the appellant, Jennifer Simpson, and the appellant's thirteen-year-old cousin, Edward McCoy. All three lived with McCoy's mother and sisters in a house a couple of blocks from the victim's house. The victim was an 84-year-old woman who lived alone. The appellant had burglarized the victim's house on at least two previous occasions.

McCoy testified that, on the morning of the offense, the appellant asked him if he wanted to go with him to burglarize the victim's house. McCoy agreed. The appellant, Jennifer, and McCoy all walked around the corner to the victim's house.

---

**5.** Although the statements were also inadmissible under Rule of Evidence 803(24), we will conduct a harm analysis under the more stringent standard established in Rule of Appellate Procedure 44.2(a) for constitutional harm.

After knocking on the door to see if anyone was home, the appellant went into the victim's garage, got a hammer and pick, and broke a window. Jennifer climbed through the window and then went around and opened the door. Once inside, Jennifer took a ring and some money, and the appellant took a watch. About fifteen minutes later the victim came home. When the victim entered the kitchen, the appellant approached her from behind and held a knife to her neck. He asked the victim for money which he then retrieved from her purse. The appellant directed McCoy and Jennifer to restrain the victim while he left to get a pillow case and duct tape. When he returned, the appellant taped the victim's mouth and bound her hands behind her back and told Jennifer to tape her legs. The appellant then put the pillow case over the victim's head, threw her over his shoulder, and carried her outside. The appellant unlocked the trunk of the victim's car and placed her inside.

The three climbed in the victim's car and drove to a couple of different locations to buy drugs. McCoy described the appellant and Jennifer as acting normally and having a good time. After purchasing marijuana [6] and making an unsuccessful attempt to buy some crack cocaine, the three drove about ten miles from Palestine to Grapeland to visit the appellant's aunt and her daughter, Shay. McCoy testified that the appellant opened the trunk and showed the victim to Shay. When the victim asked for her medicine, the appellant told her to "shut up" and slammed the lid closed. The rest of the afternoon the appellant drove around in the victim's car

visiting and congregating with various friends in Palestine, occasionally opening the trunk to show off the victim. Jennifer used the victim's cell phone throughout the day.

The original three parties were eventually joined by the appellant's brother, Lionelle Simpson, who suggested they kill the victim. The appellant drove to a dead-end, and all four got out of the car. The appellant removed the victim from the trunk, and McCoy stated the appellant "chunked her on the ground." The appellant and Lionelle re-taped the victim's arms and legs more tightly than before, beat her, and returned her to the trunk. The four proceeded to the Jack In The Box where they all ate hamburgers and french fries. After leaving the Jack In The Box, they drove to the Neches River, where the appellant and Lionelle had decided to dispose of the victim. They backed the car up to the river, opened the trunk, and Lionelle threw the victim onto the ground. Getting a running start, the appellant ran up and kicked the victim in the face. McCoy's following testimony is similar to the above objected-to hearsay statements: [7]

[McCoy]. Then Lionelle got the rope and tied the rope around her legs and [the appellant] got the other half of the rope and tied it around the brick and threw the brick in the water.

[Prosecutor]. Who threw the brick into the water?

A. [The appellant].

Q. Then what happened?

A. Then Lionelle got her hands and [the appellant] got her legs and started

---

6. McCoy stated that they bought "sweets" which he described as cigars filled with marijuana instead of tobacco and dipped in embalming fluid.

7. McCoy gave a statement shortly after his arrest in which he stated that he and Lionelle remained in the car while the appellant and Jennifer disposed of the victim. At trial, he explained that he lied in giving that statement because, on the night of the offense, Lionelle had threatened him with a .45 pistol, and he was afraid of him.

swinging her and chunked her in the river.

Others testified that later that night, the appellant "rented" them the victim's car to use for a couple of hours in exchange for drugs. Also entered into evidence was a letter written by the appellant to a cousin in which the appellant claimed he "was just the watch out person and driver of the car," and accused Jennifer and McCoy of putting the victim in the trunk and throwing her in the river. The appellant stated in the letter that he and Lionelle remained in the car.

Given the strong evidence concerning the appellant's participation in the offense, we conclude beyond a reasonable doubt that the two hearsay statements describing the appellant's actions in the final moments of the murder did not contribute to the appellant's conviction or punishment, particularly in light of the fact that McCoy testified to virtually the same evidence. Although the hearsay testimony could have added credibility to McCoy's testimony, many other witness accounts and evidence separately corroborated McCoy's testimony. Point of error eleven is overruled.

In his twelfth point of error, the appellant claims "the trial court erred by denying a mistrial after the State introduced victim impact testimony calling for the death penalty." During the punishment phase of the trial, the State called one of the victim's sons, Clyde Davidson, who testified as follows:

[Prosecutor]. And I don't think it would be appropriate for you to pursue what your mother would have wanted to do in this case, but what does your family want to have done?

[Witness]. I've talked with all my children and I've talked with my wife. I've talked with my grandchild that is an adult, and unanimously we want the death penalty.

The appellant objected under *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).[8] The court sustained the objection and instructed the jury to disregard. The appellant's request for a mistrial was denied. The prosecutor referred to the family's wishes again in closing argument:

[Prosecutor].... I can appreciate the fact that [the appellant's] father can look into a picture from the newspaper and look into [the victim's] eyes and can assume that she wouldn't want this. The family does.

The trial court sustained the appellant's objection and instructed the jury to disregard. The appellant's motion for a mistrial was overruled.

In *Payne*, 501 U.S. at 827, 111 S.Ct. 2597, the United States Supreme Court held "that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." The Supreme Court recognized the possibility that "unduly prejudicial evidence" might be introduced and held that the Due Process Clause would provide a mechanism for relief under those circumstances. *Id.* at 825, 111 S.Ct. 2597. In *Mosley v. State*, 983 S.W.2d 249, 262 (Tex.Crim.App.1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999), we held that "[b]oth victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the

---

**8.** It is not entirely clear, at trial or from the appellant's brief on appeal, whether the appellant claims Clyde Davidson's testimony and the later reference to it are objectionable as outside the scope of "victim impact evidence" or as so prejudicial as to be of due process concern, even if falling within the definition of "victim impact evidence."

uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." We have described victim-impact evidence as evidence "concerning the effect that the victim's death will have on others, particularly the victim's family members." *Mathis v. State*, 67 S.W.3d 918, 928 (Tex.Crim.App.2002) (quoting *Mosley*, 983 S.W.2d at 261).

The wishes of the victim's family members as to the defendant's fate fall beyond the parameters of victim-impact evidence and are not admissible. *Payne*, 501 U.S. at 830 n. 2, 111 S.Ct. 2597 (overruling the portion of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), relating to victim-impact evidence, but not overruling the prohibition on the victim's family's opinions on the defendant or the punishment he should receive). A statement of their opinions as to the punishment deserved by the defendant is not a reflection of how their lives have been impacted by the victim's death. Thus, Clyde Davidson's testimony was outside the scope of victim impact evidence, and the trial court appropriately sustained the appellant's objection to the testimony and instructed the jury to disregard it.[9] The appellant claims that his motion for mistrial should have been granted because the statement regarding the victim's family's wishes was so prejudicial that it tainted the jury's verdict and violated the appellant's right to a fair trial. The question is whether the court should have granted the appellant's motion for mistrial as well.

A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard. *Wood v. State*, 18 S.W.3d 642, 648 (Tex.Crim.App. 2000). Mistrial is appropriate for only "highly prejudicial and incurable errors." *Ibid.* It may be used to end trial proceedings when faced with error so prejudicial that "expenditure of further time and expense would be wasteful and futile." *Ibid.* We have held that "ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex.Crim.App.2000). The trial court is required to grant a motion for a mistrial only when the improper question is "clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Wood*, 18 S.W.3d at 648.

In this case, the erroneously elicited statement and the State's later reference to it were prejudicial, and we strongly discourage the State from soliciting or making any references to the wishes of the victim's family or friends about the punishment to which the defendant should be sentenced. But, the evidence in support of the jury's verdict on punishment was very substantial.

The evidence admitted during the punishment phase showed that the appellant was a member of a gang called the Southside Cryps whose members engaged in dealing drugs and fighting. An expert on gangs testified that the tattoos on the appellant's arm were particular to membership in the Southside Cryps. An expert

---

9. With regard to Clyde Davidson's testimony, the State correctly points out that an objection is required as soon as the ground for an objection becomes apparent. Thus, the State argues that the appellant should have objected as soon as the question was asked rather than after it was answered. But when viewed within the context of the immediately preceding questions asked by the State, the answer sought was, at least arguably, not readily apparent. Therefore, the appellant did not waive error by failing to timely object to the question.

testified about the prevalence of drugs, gangs, weapons, and violence in prison.

The evidence showed that the appellant had engaged in other burglaries. McCoy described breaking into a house with the appellant and Lionelle a block from the victim's house about a month before the instant offense. The three spray-painted the interior of the house with orange, black, and silver paint, writing their gang nick names and other gang-related words, phrases, and obscenities. Among the words painted by the appellant included "white people should die." The State introduced color photographs of the vandalism. The State introduced evidence that the appellant had committed at least two other burglaries of other people's homes.

The appellant also committed violence against other people, some of which were his own family members. A police officer testified to responding to a call from Jennifer Simpson, the appellant's wife, who claimed the appellant punched her in the face. Another officer testified that he responded to a call where a fight had taken place between the appellant and his sister. The appellant's sister told the officer that she and the appellant had fought over the appellant "fondling" his nine-year-old cousin. After exchanging blows with his sister, the appellant fled the house, knocking out all of the windows in his sister's car with a brick. The State also presented evidence that the appellant had shot at a former girlfriend with a sawed-off shotgun. One officer testified that he responded to a call from a girl who claimed the appellant assaulted her by punching her with his fist in the side of her head. In 1999, the appellant received deferred adjudication probation for ten years in exchange for pleading guilty to a charge of indecency with a child.

Finally, a psychiatrist testified that he had diagnosed the appellant with anti-so-cial personality disorder and that the appellant exhibited characteristics of a psychopath. He stated that in his opinion the appellant poses a high level of risk for future acts of criminal violence. He described the appellant as a "predator."

During the punishment phase, the defense introduced evidence of substantial verbal and physical abuse of the appellant's mother by the appellant's father while the appellant was growing up, along with evidence of neurological disfunction and injuries.

According to the appellant's evidence, he was borderline mentally retarded. He had suffered from at least two head injuries, one in which he was knocked out in a football game and remained unconscious for an hour and a half and another incident in which he was thrown from a "bucking barrel" (a simulated bucking bronco). A pediatric physician with special qualifications in pediatric neurology testified that the appellant had an abnormal neurological status as a result of the combination of his borderline mental retardation and trauma to the head resulting in concussion. A medical doctor specializing in psychiatry testified that in addition to the appellant's borderline mental retardation, childhood abuse and trauma, the appellant also has brain damage called subdural hematoma. He testified that an MRI revealed the existence of two large blood clots sitting on both sides of the appellant's brain, compressing the brain. He testified that this type of damage could affect behavior, judgment, impulse-control, and the ability to tolerate frustration. A clinical psychologist testified that the appellant was not a psychopath.

This case involved the brutal murder of an elderly woman. Also, the appellant has a history of gang membership, breaking the law, and committing violence against people close to him. All of this evidence

was received before the comment by the victim's son.

We also think that the jury would not place much weight on the erroneously elicited comment. Jurors understand that the victim's family members will be emotional and therefore less objective about what punishment should be given. It was probably no great surprise that the victim's family was in favor of the death penalty.

After reviewing the nature and extent of the evidence against the appellant and the trial court's prompt instruction, we conclude that the instruction cured any prejudice flowing from the witness's testimony and the State's argument. As a result, the trial court did not abuse its discretion in overruling the appellant's motion for mistrial. Point of error twelve is overruled.

The judgment of the trial court is affirmed.

KELLER, P.J., concurred in the judgment.