Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





FAUSTINO MORALES RAMIREZ,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee. 

§


 


§


 


§


 


§


 


§



§

No. 08-06-00273-CR



Appeal from


195th District Court


of Dallas County, Texas


(TC # F-0600756-TN)




O P I N I O N



 Faustino Morales Ramirez appeals his conviction of aggravated sexual assault. A jury found
Appellant guilty and assessed his punishment at imprisonment for five years. Based on an
affirmative finding by the jury, the trial court entered a deadly weapon finding in the judgment. We
affirm.

FACTUAL SUMMARY


 Prior to September of 2005, Alicia Garza had been involved in a romantic relationship with
Appellant for several years and had two sons, ages eight and nine, with him. They were living
together in an apartment in east Dallas but the children were living in Monterrey, Mexico with
Garza's parents. Garza referred to Appellant as her husband even though they had not been formally
married and she knew that Appellant was legally married to another woman. Appellant had been
out of town for ten days in late August and he had not left Garza any money for food. Consequently,
she had decided to return to Monterrey and she had a bus ticket for September 1. Her suitcases were
by the front door. Appellant returned home on August 31, 2005, and Garza was happy to see him. 
The couple engaged in consensual sex and went out to dinner.

 The following day, September 1, a neighbor came to the apartment and began speaking with
Appellant outside. When Appellant returned, he was angry. He kicked Garza and demanded to
know what hotel she had been to while he was gone. Garza denied going to any hotel and Appellant
left, saying that he was going to get the person who had accused her. Garza looked outside and saw
a man chastising Appellant for leaving Garza without any money or protection. Appellant grabbed
a pipe from the bed of this man's truck and the man left. Appellant came into the house with the
pipe and told Garza that they were going to the man's home to confront his wife about the affair. 
Once they got inside the truck, Appellant struck Garza's arms and knees with the pipe and he hit her
on the face and head with his fist. He also threw a jar of silicone at Garza and it broke against the
truck windows, spilling the silicone on her hair. During the assault, she continued to deny having
an affair with anyone. Someone apparently called the police and when they arrived, Garza did not
tell them that Appellant had hit her; instead she said that she had fallen. After the police left,
Appellant kicked her in the ribs and hit her while continuing to question her about the affair. Garza
denied the accusation but Appellant began hitting her body and head with the pipe. He also called
Garza a hog and a prostitute and threatened to cut off her breasts and genitals. Appellant tied one
of Garza's hands to one of her feet "like a goat" before sexually assaulting her vaginally, anally, and
orally. After the assault, she asked Appellant to take her to the hospital but Appellant refused stating
that the man from the hotel could take her. Appellant then fell asleep and Garza either fell asleep
or lost consciousness until the following morning.

 When they awoke, Garza asked Appellant to call an ambulance but he refused. He said she
needed to eat and made her go to a restaurant with him. Afterwards, he took her to the Family Dollar
store for bandages and ointment. Garza then asked Appellant to take her to the bus station so that
she could get a refund for her bus ticket to Monterrey. He did, and once she got inside, she asked
for an ambulance. The police and an ambulance arrived shortly and Garza was transported to a
hospital for treatment. Garza admitted during cross-examination that she had visited Appellant
several times in jail.

 Dallas Police Officer Ernesto Fierro was dispatched to the bus station in response to a 911
call. At the station, Fierro met with forty-seven-year-old Alicia Garza who was injured and
hysterical. Fierro initially thought she had been hit by a car. Speaking rapidly in Spanish, Garza told
Fierro that she could not believe this had happened and that she was in a lot of pain. Although Fierro
speaks Spanish, he could not understand everything Garza was saying. Emergency medical
personnel responded to the scene and transported Garza to a hospital. Fierro followed the ambulance
in order to continue his investigation.

 Garza told Fierro that she had been sexually assaulted by her husband, Appellant, at their
apartment, and she gave a written statement describing the assault. Garza said that a man stopped
by their apartment to speak with Appellant. After speaking with the man, Appellant kicked Garza
and accused her of going to a hotel with someone named "Mr. Geno." Geno had provided Garza
with money and food when Appellant went out of town for ten days. Garza denied the accusation
but Appellant began hitting her body and head with a pipe. Appellant tied Garza's hands and feet
and sexually assaulted her.

 In addition to the statements made to the police, Garza told the medical staff that she had
been held against her will and sexually assaulted by her husband. Dr. John Schorge administered
a rape examination and noted that Garza had extensive bruising and abrasions on her face, arms,
legs, abdomen, and back. Semen was found in the vaginal and anal smears collected during the rape
examination. Following her medical treatment, Garza was admitted to the rape crisis center. 

 The following day, Fierro located Ramirez at the apartment complex and arrested him. 
Detectives obtained a search warrant for the couple's apartment. When officers executed the search
warrant, they found a rope and a pipe allegedly used in the assault. Appellant gave a written
statement in which he claimed that they argued because Garza was possessive and would not let him
go out alone. During the argument, Garza punched his arms, pulled his hair, and attempted to block
the door so he could not leave. He slapped her and tried to leave the apartment but Garza tripped
over a suitcase in the kitchen and fell down. Appellant grabbed her hands and kicked her and "tried
to calm her down." They then had sexual relations and slept peacefully together on the bed. 
Appellant added that they argued because Garza is a tramp, possessive, and unfaithful. He explained
that when he returned from working in Kansas, he found men's clothing in the apartment and the
apartment manager had told him that Garza had been seen kissing other men. When Appellant told
Garza that they should separate she "went crazy, pulling her hair and butting her head on the door
jam [sic]."

 Castaneda Genovebo knows both Appellant and Garza. He provided Garza with food when
Appellant was out of town. When Appellant returned, Genovebo told Appellant that he should take
better care of Garza but Appellant became "a little violent" and took a pipe from Genovebo's truck. 
Genovebo identified the pipe found in the apartment as the one Appellant had removed from his
truck.

 Appellant presented evidence at trial that Garza had fabricated the allegations against him
in an effort to extort money. Maria Ramirez is legally married to Appellant and they have two
children. At the time of trial, she was seeking a divorce because of his affair with Garza. She had
known since 2000 that Appellant had a relationship with Garza and that he had at least one child
with her. In the latter part of August 2005 while Appellant was in Kansas, Garza called Ramirez and
told her that Appellant was going to have problems if he did not return to her within forty-eight
hours. Appellant's nineteen-year-old daughter, Janet Ramirez, testified that she had also received
a telephone call from Garza during the latter part of August asking where Appellant was, stating that
she knew where he was, and that he had forty-eight hours to return or he would regret it. Garza had
also gone into the convenience store where Janet worked on several occasions and had just stared
at her.

 Gabriela Lucero works in the family violence section of the District Attorney's Office. A
few weeks before trial, Lucero spoke with Garza about the case. Garza told Lucero that she was
going to visit Appellant in jail and if he would agree to pay her child support, she was not going to
testify against him. Lucero noted that Garza had never recanted her allegations regarding the sexual
assault. Further, in Lucero's experience with family violence cases, victims commonly visited their
assailants in jail and vacillated regarding they would prosecute the case.

FACTUAL SUFFICIENCY


 In Point of Error One, Appellant challenges the factual sufficiency of the evidence supporting
his conviction. In reviewing the factual sufficiency of the evidence to support a conviction, we are
to view all the evidence in a neutral light, favoring neither party. Johnson v. State, 23 S.W.3d 1, 7
(Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing
our review, we are to give due deference to the fact finder's determinations. See id. at 8-9; Clewis,
922 S.W.2d at 136. The fact finder is the judge of the credibility of the witnesses and may "believe
all, some, or none of the testimony." Chambers v. State, 805 S.W.2d 459, 461 (Tex.Crim.App.
1991). Evidence is factually insufficient if it is so weak that it would be clearly wrong and
manifestly unjust to allow the verdict to stand, or the finding of guilt is against the great weight and
preponderance of the available evidence. Johnson, 23 S.W.3d at 11. Therefore, the question we
must consider in conducting a factual sufficiency review is whether a neutral review of all the
evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak
as to undermine confidence in the fact finder's determination, or the proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof. See id. Under the first prong of
Johnson, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply
because, on the quantum of evidence admitted, we would have voted to acquit had we been on the
jury. Watson v. State, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Under the second prong of
Johnson, we cannot declare that a conflict in the evidence justifies a new trial simply because we
disagree with the jury's resolution of that conflict. Id. Before finding that evidence is factually
insufficient to support a verdict under the second prong of Johnson, we must be able to say, with
some objective basis in the record, that the great weight and preponderance of the evidence
contradicts the jury's verdict. Id.

 Appellant argues under the first prong of Johnson that the evidence of his guilt is so weak
that the jury's verdict is clearly wrong and manifestly unjust. In support of this argument, he points
to conflicts in Garza's trial testimony. Garza testified at trial that Appellant did not ejaculate in her
mouth. She testified that Appellant put his penis in her mouth but she could not continue due to the
pain and he forced her to "finish him off with [her] hand." Garza denied telling Officer Fierro that
Appellant had ejaculated in her mouth and she gagged and spit it out. Officer Fierro contradicted
Garza, stating that she had made that statement to him when he interviewed her.

 As evidence of a second conflict, Appellant next points to Garza's testimony on direct
examination that Appellant tied her up with a rope before sexually assaulting her anally and then
vaginally. On cross-examination, Garza said that Appellant attempted but was not successful in
tying her up completely. She explained that he tied one hand to one foot "like a goat." She showed
the jury scars on her left wrist and left foot where she had been tied.

 Appellant asserts that there is a third conflict between Garza's trial testimony and what she
told police officers. Garza testified at trial that she was not tied up when she fell asleep. 
Additionally, she testified that she and Appellant went to breakfast the following morning after he
refused to get her medical assistance and she convinced him to take her to the bus station to get a
refund on her bus ticket. At the bus station, she asked someone to call an ambulance for her. She
denied telling Officer Fierro she was still tied up when she fell asleep, that she broke free after she
woke up the next morning, and that she grabbed some clothing and walked to get help. Fierro
testified that Garza had made those statements to him.

 Finally, Garza denied telling Gabby Lucero that if Appellant "gave [her] money for [her]
kids, [she] would consider not testifying against him in the trial." Lucero, however, testified that
Garza had stated a few weeks before trial that she was going to visit Appellant in jail and if he would
agree to pay her child support she would not testify against him. Garza believed Lucero might have
misunderstood her because they did talk about her visiting Appellant and Garza questioned what
would happen to her children. Garza also admitted to having conflicted feelings about Appellant and
explained that she continued to visit him in jail because he is the father of her children.

 Appellant argues that these conflicts in the evidence render Garza's trial testimony so weak
that the jury's verdict is clearly wrong and manifestly unjust. Although there were definite conflicts
in the evidence, Garza's trial testimony was consistent with the written statement she gave to police
shortly after the assault took place. This statement was admitted into evidence and could be
compared by the jury against Garza's trial testimony. Officer Fierro admitted that he did not
understand everything that Garza said to him because she was upset and speaking so rapidly and
because there are differences between the more formal Spanish spoken by Garza and "Tex-Mex." 
Garza admitted to feeling conflicted about Appellant and Lucero testified that it is common for a
victim of family violence to waiver on the issue of whether to prosecute the assailant. Ultimately,
the jury was in the best position to determine Garza's credibility and weigh her testimony against
all of the evidence. We are unable to conclude the evidence supporting a finding of guilt is so weak
that it would be clearly wrong and manifestly unjust to allow the verdict to stand.

 Appellant also contends that the evidence is factually insufficient under the second prong of
Johnson. He asserts that Garza's testimony must be completely disregarded on appeal because it
"was completely blown out of the water by Officer Fierro and Ms. Lucero." In evaluating a claim
of factual insufficiency under the second prong of Johnson, we do not disregard evidence. To the
contrary, we examine all of the evidence in a neutral light to determine whether the evidence
supporting a finding of guilt is greatly outweighed by contrary proof. As we have previously noted,
Garza's trial testimony was consistent with the written statement she provided to the police at the
time of the offense. Further, her account of how Appellant injured her with the pipe and rope was
supported by the physical evidence. It was the jury's task to determine Garza's credibility and weigh
her testimony against the other evidence in the case. Having viewed all of the evidence in a neutral
light, we are unable to state that the great weight and preponderance of the evidence contradicts the
jury's verdict. Watson, 204 S.W.3d at 417. We find the evidence factually sufficient under both
prongs of Johnson. Point of Error One is overruled.

IMMIGRATION STATUS


 In Point of Error Two, Appellant contends that the trial court abused its discretion is failing
to order a mistrial when the prosecutor questioned witnesses about Appellant's status as an illegal
immigrant. During the punishment hearing, defense counsel asked Romicia Espudo, who is
acquainted with Appellant and his mother, whether she would be available to assist Appellant "[i]f
he has to fool with immigration because of this conviction . . . ." On cross-examination, the
prosecutor asked Espudo whether Appellant is a citizen of the United States. She replied that he is
not a naturalized citizen but he is in the country legally. The prosecutor then asked Espudo about
Appellant's immigration status. Espudo admitted that she was not aware of his immigration status. 
Appellant's mother subsequently testified that Appellant is a legal resident. The prosecutor also
asked Jay Davis, the chief probation officer for the court, whether he was aware of Appellant's
immigration status and whether Appellant could be monitored if the jury granted probation and
Appellant was subsequently deported. Davis was not familiar with Appellant's immigration status
but testified generally that if a person who is on probation gets deported, the probation office is
unable to supervise them. The United States does not have an agreement with Mexico to monitor
probationers.

 A timely objection or motion stating the specific grounds for the ruling desired is required
to preserve a complaint for appellate review. Tex.R.App.P. 33.1. Even constitutional errors may
be waived by failure to object. See Broxton v. State, 909 S.W.2d 912, 918 (Tex.Crim.App. 1995). 
Appellant did not raise any objection to the prosecutor's questioning of Espudo or Davis. Because
his assertion of error is waived, we overrule Point of Error Two.

CLOSING ARGUMENT


 In his final point of error, Appellant argues that the trial court abused its discretion by failing
to order a mistrial when the prosecutor stated during closing argument that the citizens of Dallas
County required that the jury punish Appellant. The prosecutor made the following argument:

 There is a time to hold people accountable for the bad things they do. If you want to
say that Faustino Ramirez is not a bad man for what he did to Alicia Garza, how can
you possibly say that? You remember the testimony of what happened to Alicia
Garza, how she was beaten with a pipe and those injuries were caused to her. If you
want to say he's not a bad man, how can you possibly say that? And the citizens of
Dallas County require you to punish people who do things.


The trial court sustained Appellant's objection but denied his request for an instruction to disregard
and his motion for a mistrial. The prosecutor immediately apologized and clarified that the State was
only asking the jury to enforce the law and impose a proper punishment. She went on to argue,
based on the evidence, that this was not a probation case.

 Proper jury argument must fall within one of the following areas: (1) summation of the
evidence presented at trial; (2) reasonable deductions drawn from that evidence; (3) answers to
opposing counsel's argument; and (4) pleas for law enforcement. Shannon v. State, 942 S.W.2d 591,
597 (Tex.Crim.App. 1996). In reviewing final arguments, we must consider the remarks at issue in
the context of the entire jury argument rather than isolated sentences. Denison v. State, 651 S.W.2d
754, 761 (Tex.Crim.App. 1983).

 A proper plea for law enforcement may take many forms, one of which is to argue the
relationship between the jury's verdict and the deterrence of crime in general. Borjan v. State, 787
S.W.2d 53, 55 (Tex.Crim.App. 1990). Prosecutors may properly argue that juries should deter
specific crimes by their verdict. Id. The State may also argue the impact of the jury's verdict on the
community. Id., citing Adams v. State, 685 S.W.2d 661, 671 (Tex.Crim.App. 1985); Haynes v. State,
627 S.W.2d 710, 714 (Tex.Crim.App. 1982). But the State may not argue that the community or any
particular segment of the community expects or demands either a guilty verdict or a particular
punishment because it injects facts into the case that are not in evidence. Id. An argument is
acceptable if it asks "the jury to be the voice of the community," but not if it asks "the jury to lend
its ear to the community." Cortez v. State, 683 S.W.2d 419, 421 (Tex.Crim.App. 1984).

 A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion
standard. Simpson v. State, 119 S.W.3d 262, 272 (Tex.Crim.App. 2003); Wood v. State, 18 S.W.3d
642, 648 (Tex.Crim.App. 2000). Mistrial is appropriate for only highly prejudicial and incurable
errors. Simpson, 119 S.W.3d at 272. It may be used to end trial proceedings when faced with error
so prejudicial that expenditure of further time and expense would be wasteful and futile. Id.

 Appellant has not provided any argument nor cited any authority for the proposition that the
prosecutor's argument was incurable. We do not view the argument as highly prejudicial or
incurable. The prosecutor generally stated that the community expected the jury to punish Appellant
but she did not inform the jury that the community expected a particular punishment. After the
objection was sustained, she immediately apologized and clarified that she was asking the jury to
impose a term of imprisonment based upon the facts of the case. Although a prosecutor's apology
and self-corrective action does not carry the same weight as a trial court's instruction to disregard,
it can render an improper comment harmless. Hawkins v. State, 135 S.W.3d 72, 84 (Tex.Crim.App.
2004). Further, the court instructed the jury in the charge that they must not consider, discuss, or
relate any matter or issue not in evidence. Given the nature of the comment, the prosecutor's self-corrective action, and the judge's admonishment, we find that the comment was neither highly
prejudicial nor incurable. Consequently, the trial court did not abuse its discretion by denying the
motion for mistrial. Point of Error Three is overruled. Having overruled all three points of error,
we affirm the judgment of the trial court.



November 1, 2007 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.


(Do Not Publish)