

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-10-00511-CR

JESUS MANUEL CISNEROS                                                      APPELLANT

V.

THE STATE OF TEXAS                                                                STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Jesus Manuel Cisneros of intoxication manslaughter and assessed his punishment at twenty years' confinement and a $10,000 fine. The trial court sentenced him accordingly. In two points, Appellant argues that he was denied effective assistance of counsel at the punishment stage of his trial and that the trial court abused its discretion by denying a mistrial after the prosecutor argued outside the record. Because the trial court

---

[1]*See* Tex. R. App. P. 47.4.

committed no reversible error and because Appellant did not satisfy his burden of proving ineffective assistance of counsel at trial, we affirm the trial court's judgment.

## I. Background Facts

Appellant was a Fort Worth police officer who had been honorably discharged from the military following his service in Desert Storm and in Honduras. At the time of the events at issue, Appellant had served as a Fort Worth police officer for ten years and had served in the patrol, DWI, and narcotics units. He had worked as an undercover narcotics officer as recently as December 2009.

Appellant and fellow officer Erik Martinez were working on a human trafficking investigation on the night of December 10, 2009. Appellant was driving a Toyota Highlander SUV, a city vehicle, and he and Martinez went to several bars where they drank beer and pretended to be drug dealers in an attempt to become known in that community. When they left the bars where they were working, they went to another bar, the Pour House, where police officers were holding a birthday party for a fellow narcotics officer. The Pour House was equipped with sixteen video surveillance cameras. Mark Porter, a forensic video analyst, testified that the video depicted Appellant drinking eight beers and four "shots" between 9:23 p.m. and 1:41 a.m. The trial court admitted still photographs that the analyst had isolated from the surveillance video; the photographs show Appellant's drinking the twelve drinks. The photographs

2

reflect that Appellant chugged the last beer without using his hands. Porter testified that from his review of the surveillance video, Appellant did not seem abnormal when he left the Pour House.

Appellant drove Martinez to a friend's house in the SUV, even though the evidence shows that police officers are allowed to drive a city vehicle only while on duty. In Martinez's opinion, Appellant drove well and did not appear to be intoxicated. Martinez, however, admitted to being "buzzed" after consuming seven or eight beers.

Luis Patino was driving to a Walmart at 2:00 a.m. when an SUV passed him at a high rate of speed, cut in front of him, turned right, ran a red light, and did not stay in its lane. Patino called 911 and attempted to follow the SUV, which ran another red light. Patino accelerated to sixty miles per hour in an effort to catch up to the SUV, but it was traveling at sixty-five to seventy miles per hour. Patino abandoned his pursuit and turned into the parking lot when he reached Walmart.

Sonia Baker was driving a PT Cruiser when she turned left at an intersection, and the SUV and the PT Cruiser collided. Patino testified that the SUV shown in a photograph taken after the collision looked like the SUV he had followed. Baker died at the scene as a result of blunt force trauma to the head and chest. Appellant called 911 on a department-issued cell phone but could only moan and groan.

3

Medstar arrived at the scene pursuant to a different 911 call and transported Appellant to a hospital for a blood draw. EMT Bobby Metcalf testified that on the way to the hospital, he noticed that Appellant had an odor of alcohol on his breath and that Appellant admitted that he had been drinking. Appellant's blood-alcohol level was 0.18 at 3:17 a.m.

Tim Lovett, an accident reconstructionist, testified that, in his opinion, the SUV was traveling at seventy-six miles per hour, and the PT cruiser was traveling at nine miles per hour at the time of the collision. Lovett also testified that the wreck was caused by Appellant's intoxication.

Stella Lopez, Baker's mother, testified about Baker's background, her good qualities, and the manner in which her death had affected the family.

Lieutenant Robert Rangel, Appellant's supervisor in the narcotics unit, testified without objection that a few years before the December 2009 events in this case, Appellant's wife, Carmen, had come to Rangel's home late one night and told him that another woman had told her that she was in a relationship with Appellant and that Appellant was abusing drugs and alcohol. Rangel also testified that Carmen had told him that Appellant drank too much and was intoxicated when he discharged a gun while he and Carmen were in a moving vehicle. Carmen asked Rangel not to report the woman's accusations. Rather, Carmen told him that she was trying to determine whether those accusations were true. Rangel testified that he told Carmen that he did not think that Appellant used drugs and that Appellant was subject to random drug testing.

4

Rangel, however, did report his conversation with Carmen to his supervisor and ordered Appellant to report to his office the following morning. Rangel received additional information from the chief of police and from Sergeant Herschel Tebay that an unnamed Mansfield police officer had stopped Appellant in a city vehicle one morning at 3:00 a.m. with a female passenger named Joy Ivins. Rangel testified that Appellant had violated departmental rules by driving a city vehicle when he was off-duty and by having an unauthorized person in the vehicle.

Appellant passed a drug test. Ivins stated that she had never said that Appellant used drugs, but that if she had said that he had used drugs, she had been angry and did not mean it. The other allegations were sustained in a review, and Appellant was suspended without pay for twenty days. Rangel testified that Appellant was transferred from the narcotics unit to the DWI unit because Rangel could no longer trust him with the responsibilities of a narcotics officer. Rangel had to transfer Appellant out of the narcotics unit despite the fact that Appellant was very effective at removing drugs from the streets. Appellant's superiors wanted Appellant to see the destruction caused by drunk drivers in an effort to stop Appellant from drinking excessively. Appellant was also required to enter an employee assistance program to determine the extent of his alcohol problem.

Appellant asked Rangel to allow him to return to the narcotics unit, saying that he had learned his lesson when a fellow officer was hit from behind by a

5

drunk driver and burned to death. Rangel refused his request, explaining that his captain would never allow Appellant to return to the narcotics unit. Appellant, nevertheless, successfully convinced the captain to allow him to return. Appellant, however, did not have permission to take home a city vehicle the night of the wreck. Additionally, he was drinking at a bar rather than working on the night of Baker's death.

Rangel testified that the police department was in the process of terminating Appellant when he resigned. Rangel also testified with no objection that he did not consider Appellant to be trustworthy, reliable, or a good candidate for community supervision.

Jeremy Thompson, the senior community supervision officer for the 371st District Court, was called by the defense to testify. On direct examination, he testified to the standard conditions of community supervision and stated that he would never recommend community supervision for anyone convicted of intoxication manslaughter. Thompson knew very little about Appellant or whether he personally would be a good candidate for community supervision. On cross-examination, Thompson testified that the community supervision department in Tarrant County cannot adequately supervise a person on community supervision for intoxication manslaughter. On redirect examination, Thompson testified that former law enforcement officers are harder to supervise on community supervision because they know how to beat a drug test.

Appellant assumed responsibility for his actions, and his sister, brother, and wife testified that he was remorseful. They testified that he had not drunk an alcoholic beverage or driven a vehicle since the wreck, that he was eligible for community supervision, and that he would follow the rules of community supervision.

In jury argument, the State asked for prison time, not only because of Appellant's actions in causing Baker's death but also because of his misconduct as a police officer and his infidelity to his wife. The prosecutor also reminded the jury that the community supervision officer "[did]n't think this [was] a case for [community supervision]." The defense asked for community supervision because Appellant is a decorated war veteran who has served in Desert Storm and who had been a good narcotics officer who never had problems until he began to work undercover. The defense also pointed out that Appellant did not act intentionally in causing Baker's death.

The jury assessed the maximum punishment of twenty years' imprisonment and a $10,000 fine, despite the fact that Appellant had no prior convictions and was eligible for community supervision.

## II. Ineffective Assistance of Counsel

Appellant filed a motion for new trial on punishment in which he raised ineffective assistance of counsel. Both trial counsel testified in the hearing on the motion for new trial. Appellant argued below, as he argues now in his first point, that he was denied effective assistance of counsel at the punishment stage of his

7

trial. Specifically, he argued below and argues here that his trial counsel were ineffective by

- calling the senior community supervision officer to testify, knowing that he would also testify that he would never recommend community supervision for anyone convicted of intoxication manslaughter;

- eliciting from the community supervision officer testimony that over half of the people on felony community supervision in Tarrant County were revoked in fiscal year 2010;

- eliciting from the community supervision officer testimony that law enforcement officers are harder to supervise on community supervision because they know how to beat a drug test;

- failing to object to Rangel's inadmissible hearsay testimony that Appellant's wife, Carmen, had told him that Appellant drank too much and was intoxicated when he discharged his gun while they were in a moving vehicle;

- failing to object to Rangel's inadmissible hearsay testimony that another woman had told Carmen that she was in a relationship with Appellant and that he was abusing drugs and alcohol; and

- failing to object to Rangel's inadmissible hearsay testimony that the chief of police and another officer had told him that a Mansfield police officer had stopped Appellant in a city vehicle at 3:00 a.m. with a female passenger, Ivins.

To establish ineffective assistance of counsel, the appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have

8

been different.[2]  In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case.[3]  The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.[4]  Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation.[5]  A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim.[6]  "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions."[7]  To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness."[8]  It is not appropriate for

---

[2]*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999).

[3]*Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

[4]*See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065.

[5]*Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

[6]*Salinas*, 163 S.W.3d at 740; *Thompson*, 9 S.W.3d at 813–14.

[7]*Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63).

[8]*Id.* (quoting *Thompson*, 9 S.W.3d at 813).

an appellate court to simply infer ineffective assistance based upon unclear portions of the record.[9]

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, that is, a trial with a reliable result.[10] In other words, an appellant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[11] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[12] The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged.[13]

Trial counsel testified at the hearing on Appellant's motion for new trial that the strategy had been to show that alcohol had not caused the wreck. Rather, trial counsel had intended to show very gently that Baker had caused the wreck by pulling out in front of Appellant. That had been the defense strategy all along, including during voir dire. Trial counsel's statements to the jury panel and in choosing the jury had been premised on that defense. Appellant, however, after

---

[9]*Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

[10]*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

[11]*Id.* at 694, 104 S. Ct. at 2068.

[12]*Id.*

[13]*Id.* at 697, 104 S. Ct. at 2070.

speaking to his family, decided to take full responsibility for causing the wreck because his family accepted responsibility when they did something wrong. Trial counsel testified that they discussed the ramifications of this decision with Appellant, who actively participated in his defense and in determining defense strategy.

The defense knew that Ivins had been called to testify and was available to testify. Trial counsel believed that it would be more damaging for the jury to hear Ivins testify about Appellant's infidelity and abuse of drugs and alcohol, as well as violations of departmental rules, than for the evidence to come in through Rangel. Additionally, Appellant insisted that Ivins not testify. Neither Appellant nor his counsel knew what Ivins would testify to. They were afraid that if she were allowed to testify, it would open "Pandora's Box." Trial counsel knew that they would have to call Carmen to the stand. They thought that by allowing damaging evidence to come in through Rangel's testimony, they could avoid the emotion of having the evidence come in through Carmen as well as the unpredictability of Ivins's testimony. Trial counsel also believed that they would defuse the damage of Ivins's accusations when Rangel testified that Appellant had passed the drug test. Additionally, Rangel was able to testify that Appellant was an outstanding police officer.

Appellant himself insisted on calling Rangel to testify. Trial counsel attempted to convince Appellant that the police would not be his friends when they testified at his trial, but Appellant refused to believe them. He was shocked

by Rangel's testimony. Trial counsel believed that because they were going to ask Appellant's family whether Appellant was a good candidate for community supervision, Rangel would be able to testify in response to the same question. Trial counsel admitted that they had no strategic reason for not filing a motion in limine or requesting a hearing.

Rangel's opinion of whether Appellant could successfully complete community supervision was properly admissible for the same reasons that Appellant's family's opinions were admissible: they all had personal knowledge of Appellant and what he was capable of.[14] Whether Appellant should be placed on community supervision, in Rangel's opinion, was not admissible.[15] By following their strategy, trial counsel managed to keep Ivins off the stand and to blunt the emotional force of the evidence of Appellant's poor judgment and bad behavior. And we must not forget that Appellant made the decision to call Rangel. The fact that the strategy did not produce the desired result does not raise the decision to pursue that strategy to the level of ineffective assistance of counsel.

---

[14]*See Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006) (holding that perhaps the most important factor to consider when evaluating admissibility of community supervision officer's testimony regarding a defendant is the community supervision officer's personal knowledge and perceptions of the defendant and complainant).

[15]*See Sattiewhite v. State*, 786 S.W.2d 271, 290–91 (Tex. Crim. App. 1989), *cert. denied*, 498 U.S. 881 (1990).

As to the testimony of Jeremy Thompson, both defense lawyers were aware of his opinion that people who were convicted of intoxication manslaughter should never be placed on community supervision. Both lawyers believed whether to call Thompson to testify was a judgment call. Both defense lawyers believed that Thompson's opinion regarding the viability of community supervision for a person convicted of intoxication manslaughter was admissible. When asked if trial counsel would now agree that testimony from the convicting court's community supervision officer that he did not think anybody convicted of intoxication manslaughter should ever be placed on community supervision was harmful to Appellant, counsel testified that on balance it was both damaging and helpful. Thompson had no personal knowledge of Appellant.

Trial counsel believed that much of the testimony elicited from Thompson was a double-edged sword. Their strategy was to bring out the harmful things before the State did in an attempt to blunt the impact. Trial counsel believed that Thompson's opinions were admissible and testified that their decision to call him and to ask the damaging questions themselves was trial strategy. They were incorrect in assuming the admissibility of Thompson's opinion regarding whether Appellant in particular and police officers specifically should receive community supervision.[16] It is common trial strategy for a lawyer to offer harmful testimony he expects to come in through the State in an attempt to blunt its impact. It is not

---

[16]*See* Tex. R. Evid. 602 (providing that lay witness with no personal knowledge may not testify to a matter); *Ellison*, 201 S.W.3d at 723.

appropriate trial strategy for a lawyer to offer inadmissible evidence that is harmful to his client. But here, the strategy was to offer evidence that trial counsel believed the State would elicit, and, by offering it first, to present it in the least damaging light, essentially taking the emotional wind out of the State's sails.

The decision to call Thompson to testify regarding the obligations of community supervision is a common trial strategy. It is more problematic, however, that trial counsel called someone who would testify that he would never recommend community supervision for a person convicted of intoxication manslaughter and that police officers knew how to beat drug tests. And trial counsel's belief that Thompson's testimony regarding his opinion of police officers and whether he would recommend community supervision was admissible is puzzling. Eliciting that testimony cannot be justified as trial strategy. Thompson did explain that the Tarrant County community supervision office lacked the resources to provide adequate supervision of community supervisioners who committed alcohol-related offenses. Although that testimony is also opinion testimony, it is admissible because it is within Thompson's realm of expertise and not the result of his own biases and prejudices.[17] Because the jury could have understood that the basis for Thompson's categorical refusal to recommend community supervision in any involuntary manslaughter case was

---

[17]*See* Tex. R. Evid. 602, 701; *Ellison*, 201 S.W.3d at 723.

the community supervision department's lack of resources, it could be said that presenting evidence of Appellant's willingness to seek help on his own and the family's testimony that Appellant had drunk no alcohol since the wreck was defense strategy to defeat an anticipated prosecution strategy of arguing that the community supervision department did not have the resources to provide adequate supervision of Appellant. This is what trial counsel suggested. And, although trial counsel was incorrect in believing that Thompson's opinion of who should be placed on community supervision was admissible, his testimony regarding the department's limited resources was admissible. The admissible evidence had an effect similar to that of the inadmissible evidence. Although it is difficult to understand why trial counsel would elicit this testimony when the object was to convince the jury to grant community supervision, counsel did explain the strategy. It was an attempt to be open and honest with the jury and to give the jury as much information about community supervision as possible. We cannot hold that trial counsel provided ineffective assistance of counsel because they followed a strategy that we would not have chosen or because the strategy they chose backfired. The admissible facts of the case clearly angered the jury. Given those facts, any trial strategy ran the risk of backfiring.

Applying the appropriate standard of review, and considering the record as a whole, we cannot say that Appellant sustained his burden of showing that he received ineffective assistance of counsel under the first prong of the test. Consequently, we overrule Appellant's first point.

15

### III. Improper Jury Argument

In his second point, Appellant argues that the trial court abused its discretion by denying a mistrial after a prosecutor argued outside the record during summation that the family of the deceased suspected they could not trust the police investigation because Appellant was a Fort Worth police officer and would "get a break." Appellant timely objected to the improper argument. The trial court sustained the objection and instructed the jury to disregard the argument.

When a trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion by denying the mistrial.[18] Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, that is, "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required.[19] In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct; (2) curative measures; and (3) the certainty of the punishment assessed absent the misconduct.[20] We assume the jury followed the trial court's

---

[18]*Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004).

[19]*Id.*; *see also Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004).

[20]*Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

instruction and disregarded the argument.[21]   The prompt instruction of the conscientious trial court cured any harm caused by the argument.[22]   We overrule Appellant's second point.

## IV. Conclusion

Having overruled Appellant's two points, we affirm the trial court's judgment.


LEE ANN DAUPHINOT
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 1, 2012

---

[21]*See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

[22]*See Simpson*, 119 S.W.3d at 274.