02-10-511-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00511-CR

 

 


 
 
 Jesus Manuel Cisneros
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 371st
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

A
jury convicted Appellant Jesus Manuel Cisneros of intoxication manslaughter and
assessed his punishment at twenty years’ confinement and a $10,000 fine.  The
trial court sentenced him accordingly.  In two points, Appellant argues that he
was denied effective assistance of counsel at the punishment stage of his trial
and that the trial court abused its discretion by denying a mistrial after the
prosecutor argued outside the record.  Because the trial court committed no
reversible error and because Appellant did not satisfy his burden of proving ineffective
assistance of counsel at trial, we affirm the trial court’s judgment.

I. 
Background Facts

Appellant
was a Fort Worth police officer who had been honorably discharged from the
military following his service in Desert Storm and in Honduras.  At the time of
the events at issue, Appellant had served as a Fort Worth police officer for ten
years and had served in the patrol, DWI, and narcotics units.  He had worked as
an undercover narcotics officer as recently as December 2009.

Appellant
and fellow officer Erik Martinez were working on a human trafficking
investigation on the night of December 10, 2009.  Appellant was driving a Toyota
Highlander SUV, a city vehicle, and he and Martinez went to several bars where
they drank beer and pretended to be drug dealers in an attempt to become known
in that community.  When they left the bars where they were working, they went
to another bar, the Pour House, where police officers were holding a birthday
party for a fellow narcotics officer.  The Pour House was equipped with sixteen
video surveillance cameras.  Mark Porter, a forensic video analyst, testified
that the video depicted Appellant drinking eight beers and four “shots” between
9:23 p.m. and 1:41 a.m.  The trial court admitted still photographs that the
analyst had isolated from the surveillance video; the photographs show
Appellant’s drinking the twelve drinks.  The photographs reflect that Appellant
chugged the last beer without using his hands.  Porter testified that from his
review of the surveillance video, Appellant did not seem abnormal when he left
the Pour House.

Appellant
drove Martinez to a friend’s house in the SUV, even though the evidence shows
that police officers are allowed to drive a city vehicle only while on duty.  In
Martinez’s opinion, Appellant drove well and did not appear to be intoxicated.  Martinez,
however, admitted to being “buzzed” after consuming seven or eight beers.

Luis
Patino was driving to a Walmart at 2:00 a.m. when an SUV passed him at a high
rate of speed, cut in front of him, turned right, ran a red light, and did not
stay in its lane.  Patino called 911 and attempted to follow the SUV, which ran
another red light.  Patino accelerated to sixty miles per hour in an effort to
catch up to the SUV, but it was traveling at sixty-five to seventy miles per
hour.  Patino abandoned his pursuit and turned into the parking lot when he
reached Walmart.

Sonia
Baker was driving a PT Cruiser when she turned left at an intersection, and the
SUV and the PT Cruiser collided.  Patino testified that the SUV shown in a
photograph taken after the collision looked like the SUV he had followed.  Baker
died at the scene as a result of blunt force trauma to the head and chest.  Appellant
called 911 on a department-issued cell phone but could only moan and groan.

Medstar
arrived at the scene pursuant to a different 911 call and transported Appellant
to a hospital for a blood draw.  EMT Bobby Metcalf testified that on the way to
the hospital, he noticed that Appellant had an odor of alcohol on his breath
and that Appellant admitted that he had been drinking.  Appellant’s
blood-alcohol level was 0.18 at 3:17 a.m.

Tim
Lovett, an accident reconstructionist, testified that, in his opinion, the SUV
was traveling at seventy-six miles per hour, and the PT cruiser was traveling
at nine miles per hour at the time of the collision.  Lovett also testified
that the wreck was caused by Appellant’s intoxication.

Stella
Lopez, Baker’s mother, testified about Baker’s background, her good qualities,
and the manner in which her death had affected the family.

Lieutenant
Robert Rangel, Appellant’s supervisor in the narcotics unit, testified without
objection that a few years before the December 2009 events in this case, Appellant’s
wife, Carmen, had come to Rangel’s home late one night and told him that
another woman had told her that she was in a relationship with Appellant and
that Appellant was abusing drugs and alcohol.  Rangel also testified that
Carmen had told him that Appellant drank too much and was intoxicated when he
discharged a gun while he and Carmen were in a moving vehicle.  Carmen asked
Rangel not to report the woman’s accusations.  Rather, Carmen told him that she
was trying to determine whether those accusations were true.  Rangel testified
that he told Carmen that he did not think that Appellant used drugs and that
Appellant was subject to random drug testing.

Rangel,
however, did report his conversation with Carmen to his supervisor and ordered
Appellant to report to his office the following morning.  Rangel received
additional information from the chief of police and from Sergeant Herschel
Tebay that an unnamed Mansfield police officer had stopped Appellant in a city
vehicle one morning at 3:00 a.m. with a female passenger named Joy Ivins.  Rangel
testified that Appellant had violated departmental rules by driving a city
vehicle when he was off-duty and by having an unauthorized person in the
vehicle.

Appellant
passed a drug test.  Ivins stated that she had never said that Appellant used
drugs, but that if she had said that he had used drugs, she had been angry and
did not mean it.  The other allegations were sustained in a review, and
Appellant was suspended without pay for twenty days.  Rangel testified that
Appellant was transferred from the narcotics unit to the DWI unit because
Rangel could no longer trust him with the responsibilities of a narcotics
officer.  Rangel had to transfer Appellant out of the narcotics unit despite
the fact that Appellant was very effective at removing drugs from the streets.  Appellant’s
superiors wanted Appellant to see the destruction caused by drunk drivers in an
effort to stop Appellant from drinking excessively.  Appellant was also
required to enter an employee assistance program to determine the extent of his
alcohol problem.

Appellant
asked Rangel to allow him to return to the narcotics unit, saying that he had
learned his lesson when a fellow officer was hit from behind by a drunk driver
and burned to death.  Rangel refused his request, explaining that his captain would
never allow Appellant to return to the narcotics unit.  Appellant, nevertheless,
successfully convinced the captain to allow him to return.  Appellant, however,
did not have permission to take home a city vehicle the night of the wreck.  Additionally,
he was drinking at a bar rather than working on the night of Baker’s death.

Rangel
testified that the police department was in the process of terminating
Appellant when he resigned.  Rangel also testified with no objection that he did
not consider Appellant to be trustworthy, reliable, or a good candidate for community
supervision.

Jeremy
Thompson, the senior community supervision officer for the 371st District
Court, was called by the defense to testify.  On direct examination, he
testified to the standard conditions of community supervision and stated that
he would never recommend community supervision for anyone convicted of
intoxication manslaughter.  Thompson knew very little about Appellant or
whether he personally would be a good candidate for community supervision.  On
cross-examination, Thompson testified that the community supervision department
in Tarrant County cannot adequately supervise a person on community supervision
for intoxication manslaughter.  On redirect examination, Thompson testified
that former law enforcement officers are harder to supervise on community
supervision because they know how to beat a drug test.

Appellant
assumed responsibility for his actions, and his sister, brother, and wife
testified that he was remorseful.  They testified that he had not drunk an
alcoholic beverage or driven a vehicle since the wreck, that he was eligible
for community supervision, and that he would follow the rules of community
supervision.

In jury
argument, the State asked for prison time, not only because of Appellant’s
actions in causing Baker’s death but also because of his misconduct as a police
officer and his infidelity to his wife.  The prosecutor also reminded the jury
that the community supervision officer “[did]n’t think this [was] a case for [community
supervision].”  The defense asked for community supervision because Appellant is
a decorated war veteran who has served in Desert Storm and who had been a good
narcotics officer who never had problems until he began to work undercover.  The
defense also pointed out that Appellant did not act intentionally in causing
Baker’s death.

The
jury assessed the maximum punishment of twenty years’ imprisonment and a
$10,000 fine, despite the fact that Appellant had no prior convictions and was
eligible for community supervision.

II. 
Ineffective Assistance of Counsel

Appellant
filed a motion for new trial on punishment in which he raised ineffective
assistance of counsel.  Both trial counsel testified in the hearing on the
motion for new trial.  Appellant argued below, as he argues now in his first
point, that he was denied effective assistance of counsel at the punishment
stage of his trial.  Specifically, he argued below and argues here that his
trial counsel were ineffective by

·                   
calling
the senior community supervision officer to testify, knowing that he would also
testify that he would never recommend community supervision for anyone
convicted of intoxication manslaughter;

 

·                   
eliciting
from the community supervision officer testimony that over half of the people
on felony community supervision in Tarrant County were revoked in fiscal year
2010;

 

·                   
eliciting
from the community supervision officer testimony that law enforcement officers
are harder to supervise on community supervision because they know how to beat
a drug test;

 

·                   
failing
to object to Rangel’s inadmissible hearsay testimony that Appellant’s wife,
Carmen, had told him that Appellant drank too much and was intoxicated when he
discharged his gun while they were in a moving vehicle;

 

·                   
failing
to object to Rangel’s inadmissible hearsay testimony that another woman had
told Carmen that she was in a relationship with Appellant and that he was
abusing drugs and alcohol; and

 

·                   
failing
to object to Rangel’s inadmissible hearsay testimony that the chief of police
and another officer had told him that a Mansfield police officer had stopped
Appellant in a city vehicle at 3:00 a.m. with a female passenger, Ivins.

 

To establish ineffective assistance of counsel, the
appellant must show by a preponderance of the evidence that his counsel’s
representation fell below the standard of prevailing professional norms and
that there is a reasonable probability that, but for counsel’s deficiency, the
result of the trial would have been different.[2]  In
evaluating the effectiveness of counsel under the first prong, we look to the
totality of the representation and the particular circumstances of each case.[3] 
The issue is whether counsel’s assistance was reasonable under all the
circumstances and prevailing professional norms at the time of the alleged
error.[4] 
Review of counsel’s representation is highly deferential, and the reviewing
court indulges a strong presumption that counsel’s conduct fell within a wide
range of reasonable representation.[5]  A
reviewing court will rarely be in a position on direct appeal to fairly
evaluate the merits of an ineffective assistance claim.[6] 
“In the majority of cases, the record on direct appeal is undeveloped and
cannot adequately reflect the motives behind trial counsel’s actions.”[7]  To
overcome the presumption of reasonable professional assistance, “any allegation
of ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness.”[8]  It
is not appropriate for an appellate court to simply infer ineffective
assistance based upon unclear portions of the record.[9]

The second prong of Strickland requires a showing
that counsel’s errors were so serious that they deprived the defendant of a
fair trial, that is, a trial with a reliable result.[10]  In
other words, an appellant must show that there is a reasonable probability
that, but for counsel’s unprofessional errors, the result of the proceeding
would have been different.[11]  A
reasonable probability is a probability sufficient to undermine confidence in
the outcome.[12] 
The ultimate focus of our inquiry must be on the fundamental fairness of the
proceeding in which the result is being challenged.[13]

Trial
counsel testified at the hearing on Appellant’s motion for new trial that the
strategy had been to show that alcohol had not caused the wreck.  Rather, trial
counsel had intended to show very gently that Baker had caused the wreck by
pulling out in front of Appellant.  That had been the defense strategy all along,
including during voir dire.  Trial counsel’s statements to the jury panel and
in choosing the jury had been premised on that defense.  Appellant, however,
after speaking to his family, decided to take full responsibility for causing
the wreck because his family accepted responsibility when they did something
wrong.  Trial counsel testified that they discussed the ramifications of this
decision with Appellant, who actively participated in his defense and in
determining defense strategy.

The
defense knew that Ivins had been called to testify and was available to
testify.  Trial counsel believed that it would be more damaging for the jury to
hear Ivins testify about Appellant’s infidelity and abuse of drugs and alcohol,
as well as violations of departmental rules, than for the evidence to come in
through Rangel.  Additionally, Appellant insisted that Ivins not testify.  Neither
Appellant nor his counsel knew what Ivins would testify to.  They were afraid
that if she were allowed to testify, it would open “Pandora’s Box.”  Trial
counsel knew that they would have to call Carmen to the stand.  They thought
that by allowing damaging evidence to come in through Rangel’s testimony, they
could avoid the emotion of having the evidence come in through Carmen as well
as the unpredictability of Ivins’s testimony.  Trial counsel also believed that
they would defuse the damage of Ivins’s accusations when Rangel testified that
Appellant had passed the drug test.  Additionally, Rangel was able to testify
that Appellant was an outstanding police officer.

Appellant
himself insisted on calling Rangel to testify.  Trial counsel attempted to
convince Appellant that the police would not be his friends when they testified
at his trial, but Appellant refused to believe them.  He was shocked by Rangel’s
testimony.  Trial counsel believed that because they were going to ask
Appellant’s family whether Appellant was a good candidate for community
supervision, Rangel would be able to testify in response to the same question.  Trial
counsel admitted that they had no strategic reason for not filing a motion in
limine or requesting a hearing.

Rangel’s
opinion of whether Appellant could successfully complete community supervision
was properly admissible for the same reasons that Appellant’s family’s opinions
were admissible:  they all had personal knowledge of Appellant and what he was
capable of.[14]  Whether Appellant
should be placed on community supervision, in Rangel’s opinion, was not
admissible.[15]  By following their
strategy, trial counsel managed to keep Ivins off the stand and to blunt the
emotional force of the evidence of Appellant’s poor judgment and bad behavior. 
And we must not forget that Appellant made the decision to call Rangel.  The
fact that the strategy did not produce the desired result does not raise the
decision to pursue that strategy to the level of ineffective assistance of
counsel.

As
to the testimony of Jeremy Thompson, both defense lawyers were aware of his
opinion that people who were convicted of intoxication manslaughter should
never be placed on community supervision.  Both lawyers believed whether to
call Thompson to testify was a judgment call.  Both defense lawyers believed
that Thompson’s opinion regarding the viability of community supervision for a
person convicted of intoxication manslaughter was admissible.  When asked if trial
counsel would now agree that testimony from the convicting court’s community
supervision officer that he did not think anybody convicted of intoxication
manslaughter should ever be placed on community supervision was harmful to
Appellant, counsel testified that on balance it was both damaging and helpful.  Thompson
had no personal knowledge of Appellant.

Trial
counsel believed that much of the testimony elicited from Thompson was a double-edged
sword.  Their strategy was to bring out the harmful things before the State did
in an attempt to blunt the impact.  Trial counsel believed that Thompson’s
opinions were admissible and testified that their decision to call him and to ask
the damaging questions themselves was trial strategy.  They were incorrect in
assuming the admissibility of Thompson’s opinion regarding whether Appellant in
particular and police officers specifically should receive community
supervision.[16]  It is common trial
strategy for a lawyer to offer harmful testimony he expects to come in through
the State in an attempt to blunt its impact.  It is not appropriate trial
strategy for a lawyer to offer inadmissible evidence that is harmful to his
client.  But here, the strategy was to offer evidence that trial counsel
believed the State would elicit, and, by offering it first, to present it in
the least damaging light, essentially taking the emotional wind out of the
State’s sails.

The
decision to call Thompson to testify regarding the obligations of community
supervision is a common trial strategy.  It is more problematic, however, that trial
counsel called someone who would testify that he would never recommend community
supervision for a person convicted of intoxication manslaughter and that police
officers knew how to beat drug tests.  And trial counsel’s belief that Thompson’s
testimony regarding his opinion of police officers and whether he would
recommend community supervision was admissible is puzzling.  Eliciting that
testimony cannot be justified as trial strategy.  Thompson did explain that the
Tarrant County community supervision office lacked the resources to provide
adequate supervision of community supervisioners who committed alcohol-related
offenses.  Although that testimony is also opinion testimony, it is admissible
because it is within Thompson’s realm of expertise and not the result of his
own biases and prejudices.[17]  Because the jury could
have understood that the basis for Thompson’s categorical refusal to recommend community
supervision in any involuntary manslaughter case was the community supervision
department’s lack of resources, it could be said that presenting evidence of
Appellant’s willingness to seek help on his own and the family’s testimony that
Appellant had drunk no alcohol since the wreck was defense strategy to defeat an
anticipated prosecution strategy of arguing that the community supervision
department did not have the resources to provide adequate supervision of
Appellant.  This is what trial counsel suggested.  And, although trial counsel
was incorrect in believing that Thompson’s opinion of who should be placed on community
supervision was admissible, his testimony regarding the department’s limited
resources was admissible.  The admissible evidence had an effect similar to
that of the inadmissible evidence.  Although it is difficult to understand why
trial counsel would elicit this testimony when the object was to convince the
jury to grant community supervision, counsel did explain the strategy.  It was
an attempt to be open and honest with the jury and to give the jury as much
information about community supervision as possible.  We cannot hold that trial
counsel provided ineffective assistance of counsel because they followed a
strategy that we would not have chosen or because the strategy they chose
backfired.  The admissible facts of the case clearly angered the jury.  Given
those facts, any trial strategy ran the risk of backfiring.

Applying
the appropriate standard of review, and considering the record as a whole, we
cannot say that Appellant sustained his burden of showing that he received
ineffective assistance of counsel under the first prong of the test.  Consequently,
we overrule Appellant’s first point.

III. 
Improper Jury Argument

In
his second point, Appellant argues that the trial court abused its discretion
by denying a mistrial after a prosecutor argued outside the record during
summation that the family of the deceased suspected they could not trust the
police investigation because Appellant was a Fort Worth police officer and
would “get a break.”  Appellant timely objected to the improper argument.  The
trial court sustained the objection and instructed the jury to disregard the
argument.

When
a trial court sustains an objection and instructs the jury to disregard but
denies a defendant’s motion for a mistrial, the issue is whether the trial
court abused its discretion by denying the mistrial.[18]  Only in extreme
circumstances, when the prejudice caused by the improper argument is incurable,
that is, “so prejudicial that expenditure of further time and expense would be
wasteful and futile,” will a mistrial be required.[19]  In determining whether a
trial court abused its discretion by denying a mistrial, we balance three
factors:  (1) the severity of the misconduct; (2) curative
measures; and (3) the certainty of the punishment assessed absent the
misconduct.[20] 
We assume the jury followed the trial court’s instruction and disregarded the
argument.[21]  The prompt instruction
of the conscientious trial court cured any harm caused by the argument.[22]
 We overrule Appellant’s second point.

IV. 
Conclusion

Having
overruled Appellant’s two points, we affirm the trial court’s judgment.

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and WALKER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  March 1, 2012









[1]See Tex. R. App. P. 47.4.





[2]Strickland v.
Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Davis v.
State, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009); Hernandez v. State,
988 S.W.2d 770, 770 (Tex. Crim. App. 1999).





[3]Thompson v. State, 9
S.W.3d 808, 813 (Tex. Crim. App. 1999).





[4]See Strickland, 466
U.S. at 688–89, 104 S. Ct. at 2065.





[5]Salinas v. State,
163 S.W.3d 734, 740 (Tex. Crim. App. 2005); Mallett v. State, 65 S.W.3d
59, 63 (Tex. Crim. App. 2001).





[6]Salinas, 163 S.W.3d
at 740; Thompson, 9 S.W.3d at 813–14.





[7]Salinas, 163 S.W.3d
at 740 (quoting Mallett, 65 S.W.3d at 63).





[8]Id. (quoting Thompson,
9 S.W.3d at 813).





[9]Mata v. State, 226
S.W.3d 425, 432 (Tex. Crim. App. 2007).





[10]Strickland, 466
U.S. at 687, 104 S. Ct. at 2064.





[11]Id. at 694, 104 S.
Ct. at 2068.





[12]Id.





[13]Id. at 697, 104 S.
Ct. at 2070.





[14]See Ellison v. State,
201 S.W.3d 714, 723 (Tex. Crim. App. 2006) (holding that perhaps the most
important factor to consider when evaluating admissibility of community
supervision officer’s testimony regarding a defendant is the community
supervision officer’s personal knowledge and perceptions of the defendant and
complainant).





[15]See Sattiewhite v.
State, 786 S.W.2d 271, 290–91 (Tex. Crim. App. 1989), cert. denied,
498 U.S. 881 (1990).





[16]See Tex. R. Evid.
602 (providing that lay witness with no personal knowledge may not
testify to a matter); Ellison, 201 S.W.3d at 723.





[17]See Tex. R. Evid.
602, 701; Ellison, 201 S.W.3d at 723.





[18]Hawkins v. State,
135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004).





[19]Id.; see also
Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert.
denied, 542 U.S. 905 (2004).





[20]Hawkins, 135
S.W.3d at 77; Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)
(op. on reh’g), cert. denied, 526 U.S. 1070 (1999).





[21]See Colburn v. State,
966 S.W.2d 511, 520 (Tex. Crim. App. 1998).





[22]See Simpson, 119
S.W.3d at 274.