**Opinion issued August 20, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00974-CR

————————————

**HUGO ROMERO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 337th District Court
Harris County, Texas
Trial Court Case No. 1253992

## MEMORANDUM OPINION

A jury convicted appellant Hugo Romero of possession with intent to deliver

400 grams or more of a controlled substance, cocaine. *See* TEX. HEALTH & SAFETY

CODE ANN. §§ 481.102(3)(D), 481.112(f) (West 2010). The jury also found that he

used or exhibited a deadly weapon during the commission of that offense, and it assessed punishment at imprisonment for 50 years and a $125,000 fine. In his sole issue, Romero challenges the trial court's denial of his motion for mistrial after the prosecutor referenced the results of a ballistics test which were inadmissible hearsay. Because the prosecutor's statement was not the kind of extreme, prejudicial statement that could not have been cured by the trial court's instruction to disregard, we affirm.

## Background

Houston police officers responded to a call regarding a shooting at a residence leased by appellant Hugo Romero and his friend Julian Lozano. In front of the house, a car had crashed into a parked school bus. Inside, they found Enrique Berman shot to death, lying on the kitchen floor. After searching the house, the officers found over 440 grams of cocaine in Romero's bedroom.

Romero was charged with murder and with possession with intent to deliver over 400 grams of a controlled substance. The murder charge was severed and Romero was prosecuted for the drug offense. Berman's death was not mentioned until the punishment phase of the trial, after the jury had found Romero guilty.

Romero did not deny shooting Berman, but he said that it was an accident. He testified that he had started talking to Berman about guns and retrieved Lozano's gun. When Romero showed the gun to Berman, Romero dropped it.

2

According to his testimony, he caught the gun and must have inadvertently touched the trigger. Berman's girlfriend, Rosalinda Machado, was present and immediately afterward she saw Romero standing with the gun in his hand. Romero then went to Lozano's room, woke him, and told him that "there's been an accident." Lozano called 9-1-1 after he determined that Romero had not called for help. Lozano testified that Romero asked him to "help him out" and "get rid of the gun." Romero started "walking around like a zombie" and moving around clothes in his car. Then Romero attempted to leave in his car, but he collided with a school bus.

Supporting the contention that the shooting was an accident, both Romero and Lozano testified that Romero was inexperienced with guns. Romero, Lozano, and Machado all agreed that there was no argument or disagreement between Romero and Berman and that they were good friends. Machado testified that Romero had been friendly and cordial to Berman and her before the shooting, offering them beer. Romero admitted that he did not check to see if the gun was loaded, but he advanced the theory that the revolver had been modified to have a "hairline trigger pull."

A homicide detective involved in the case testified that the gun was a revolver that required "quite a bit of pressure" to depress the trigger to fire it. He also testified that the fact that the revolver was loaded could be determined even with the cylinder closed because "the edge[s] of the rims on the bullets" would be

3

visible. On cross-examination of the detective, Romero's attorney sought to emphasize the detective's lack of credentials to offer an opinion about the gun:

> DEFENSE COUNSEL: . . . You're not an expert in weapons, right?
>
> DETECTIVE: I am not an expert, no.
>
> DEFENSE COUNSEL: So, therefore, you send it out to get it tested and get a ballistics report, correct?
>
> DETECTIVE: Yes.
>
> DEFENSE COUNSEL: You didn't do the ballistics report or the ballistics test?
>
> DETECTIVE: I did not personally.

On redirect, the prosecutor asked the detective about the ballistics testing first referenced by Romero's attorney:

> PROSECUTOR: Defense counsel asked if you were an expert in ballistics, and you said no. Is that why you had the gun tested by experts in ballistics?
>
> DETECTIVE: Yes.
>
> PROSECUTOR: And, as you stated on direct examination, is that why you checked to make sure that those experts were able to conclude that the gun was working properly?
>
> DETECTIVE: Yes.
>
> DEFENSE COUNSEL: Objection, Your Honor, hearsay.
>
> COURT: Sustained.
>
> DEFENSE COUNSEL: Instruct the jury to disregard his last response, Judge.

COURT:  The jury will disregard.

DEFENSE COUNSEL:  Move for a mistrial, Judge.

COURT:  Denied.

After finding that Romero exhibited a deadly weapon during the commission of the offense, the jury assessed his punishment as 50 years in prison and a fine of $125,000.  In his sole issue on appeal, Romero challenges trial court's denial of his motion for mistrial.

**Analysis**

**I.    Waiver**

The State argues that Romero has waived his sole argument on appeal because his defense counsel failed to timely object to the prosecutor's question eliciting hearsay.  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  TEX. R. EVID. 801(d).  In order to be considered timely, the objection must be made at the first opportunity or as soon as the basis of the objection becomes apparent.  *Aguilar v. State*, 26 S.W.3d 901, 905–06 (Tex. Crim. App. 2000); *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997).  If possible, a timely objection should be made before the evidence is improperly admitted.  *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991); *Jasso v. State*, 112 S.W.3d 805, 813 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

5

Here, the objection was made as soon as reasonably possible. The basis for the objection, that the prosecutor stated the conclusions of the ballistics experts, was clear in only the second half of the prosecutor's question:

> PROSECUTOR: And, as you stated on direct examination, is that why you checked to make sure that those experts were able to conclude that the gun was working properly?
>
> DETECTIVE: Yes.
>
> DEFENSE COUNSEL: Objection, Your Honor, hearsay.

Before the prosecutor said "were able to conclude," it was not apparent whether the prosecutor was merely asking the detective to again confirm that he had sent the revolver to ballistics testing by "experts." Defense counsel's objection follows immediately on the heels of the detective's short, one-word answer. From the transcript, we cannot conclude that the defense counsel waited or hesitated in making the objection; in fact, it may have been contemporaneous with the detective's one-word answer.

The record does not clearly demonstrate an untimely objection. Although the standard for a timely objection is both demanding and unforgiving, *Jasso*, 112 S.W.3d at 813, it also recognizes that it is not always possible to object before evidence is offered. *See Ethington*, 819 S.W.2d at 858. When it is not possible to object before admission, as here when the objectionable remark came at the end of a short question, the objection is timely as long as counsel "objected as soon as the

objectionable nature of the evidence became apparent" and moved to strike the evidence. *Id.* In this case, defense counsel did both. He objected immediately after the detective's one-word response, rather than waiting for any additional questions to be asked and answered or allowing lengthy testimony to continue. *See Lagrone*, 942 S.W.2d at 618 ("Appellant did not object until the prosecutor's question had been asked and answered, and the prosecutor had passed the witness."); *Ethington*, 819 S.W.2d at 857–58 (defense objected to prosecutor's initial question about an armed robbery, but then never objected to multiple subsequent questions and answers concerning the details of the planned armed robbery); *Jasso*, 112 S.W.3d at 813 (police officer's answer mentioned that objectionable lie-detector test was administered, but no objection until after a subsequent question and answer about the test); *Jones v. State*, 111 S.W.3d 600, 604 (Tex. App.—Dallas 2003, pet. ref'd) ("Jones did not object until after the officer's last response . . . . However, the basis for Jones's objection became apparent after the State's first question.").

Accordingly, we conclude that Romero has not waived his complaint on appeal for failure to make a timely objection.

## II.     Denial of motion for mistrial

When a trial court denies a defendant's motion for mistrial after sustaining an objection and instructing the jury to disregard, the dispositive issue is the denial

of a mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). We review the trial court's refusal to grant a mistrial for an abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009); *Bryant v. State*, 340 S.W.3d 1, 12 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling, upholding the ruling if it was within the zone of reasonable disagreement. *Bokemeyer v. State*, 355 S.W.3d 199, 202 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required. *Hawkins*, 135 S.W.3d at 77. "[O]rdinarily, a prompt instruction to disregard will cure error associated with an improper question and answer." *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *see also Russeau v. State*, 171 S.W.3d 871, 885 (Tex. Crim. App. 2005).

Although we do not conduct the usual harm analysis in deciding whether the trial court abused its discretion, "whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis." *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007) (quoting *Hawkins*, 135 S.W.3d at 77). In determining whether a trial court abused its discretion in denying a mistrial, we apply a version of the three-part *Mosley* test tailored for punishment proceedings. *Id.* (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.

8

Crim. App. 1998)).  We balance three factors: (1) the severity of the misconduct (the statements' prejudicial effect), (2) curative measures (the efficacy of any cautionary instruction by the judge), and (3) the certainty of the punishment assessed absent the misconduct (the likelihood of the same punishment being assessed). *Hawkins*, 135 S.W.3d at 77; *see Archie*, 221 S.W.3d at 700.

Romero argues that the question about the ballistics test was highly prejudicial because it related to whether he intentionally shot Berman, although other evidence was presented supporting the theory that it was an accident. Relying on *Crawford v. State*, 603 S.W.2d 874 (Tex. Crim. App. 1980), Romero contends that the court's instruction to disregard was insufficient to remove the impression left by the question because it was the "only evidence on the status of the actual weapon."  In *Crawford*, however, the improper statement at issue directly repudiated the defense's central theory and introduced improper past conduct evidence.  While addressing the defense's theory of self-defense or manslaughter in that murder case, the complainant's son testified that the defendant had previously attempted to poison the victim. *See id.* at 876.

The disclosure in this case that the gun was "working properly" was not a severely prejudicial statement in the same sense as the statement in *Crawford*.  The defense theory that the gun's trigger had been modified was only one piece of evidence related to whether the shooting was an accident, and it was not the main

9

focus of the evidence about Romero's intent. The jury was presented with uncontradicted testimony that Romero was inexperienced with guns, that he had failed to determine if the gun was loaded, that he and Berman were "good friends," and that there was no dispute or disagreement between them. Furthermore, the substance of the inadmissible statement was that the revolver was "working properly." This did not tend to prove or disprove either the officer's claim that "quite a bit of pressure" on the trigger was necessary to fire the revolver or Romero's suggestion that the gun had been modified. Accordingly, the prejudicial effect of the prosecutor's reference to a ballistics report stating that the gun was working properly was not great.

Furthermore, the disclosure did not expose any new information about Romero's prior bad acts or offenses. *See Bryant*, 340 S.W.3d at 13. Instead it merely referred to a ballistics report first brought up by the defense. This kind of statement was not a clearly calculated attempt to "inflame the minds of the jury." *See Huffman v. State*, 746 S.W.2d 212, 218 (Tex. Crim. App. 1988) (describing incurable improper questions). Thus, we conclude that the prosecutor's statement was not "of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Russeau*, 171 S.W.3d at 885; *Ladd v. State*, 3 S.W.3d 547, 566–67 (Tex. Crim. App. 1999) (mistrial not required

10

when prosecution revealed defendant was smoking crack cocaine on the night of murder and terminated from employment a few months before).

Because the statement about the gun was not so inflammatory as to leave an indelible impression on the jury, the trial court's immediate instruction to disregard the testimony should have been effective to cure any harm that resulted from the improper question. We presume that the jurors followed the trial court's instruction to disregard the prosecutor's statement. *See Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex. Crim. App. 2000); *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). The comment that the gun was working properly does not amount to such an extreme circumstance that would warrant a mistrial despite the curative instruction. *See Hawkins*, 135 S.W.3d at 77, 84–85.

Finally, the punishment range for possession of more than 400 grams of cocaine is imprisonment for a term between 15 and 99 years, and a fine not to exceed $250,000. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102, 481.112. Romero's punishment was well within the punishment range: 50 years and a fine of $125,000. A deadly weapon finding is authorized upon sufficient evidence that a defendant "used or exhibited" a deadly weapon during the commission of or flight from a felony offense. TEX. CODE CRIM. PROC. ANN. art. 42.12 § 3g(a)(2). A firearm is a deadly weapon. TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West Supp. 2012). The effect of the deadly-weapon finding is that Romero will not be

11

eligible for parole until he has served one-half of his sentence or 30 years, whichever is less. *See* TEX. GOV'T CODE ANN. § 508.145(d)(1) (West 2012).

Although he said it was accidental, Romero admitted that he shot Berman. In addition to the issue of Romero's intent, the jury heard evidence concerning other issues that would bear on an appropriate sentence for Romero. This evidence included the fact that Romero apparently did not try to get help for Berman, and instead he attempted to flee. Other evidence relevant to punishment included testimony that Romero was a hard worker with good character. The jury also heard the testimony of Berman's father that his passing had caused great sorrow to his family, particularly affecting him, his wife, and Berman's children. Considering the totality of this evidence and the relatively slight focus on the issue of the trigger-pull during the punishment phase of the trial, there is no reason to conclude that the punishment the jury assessed would have been any different if the question concerning the ballistics test had not been asked. *See Archie*, 221 S.W.3d at 700 (upholding decision that, "due to the strength of the State's punishment case, it is likely that the same punishment would have been assessed regardless of the improper comment"). Likewise, due to the strength of the State's case supporting the deadly weapon finding, it is likely that the jury would have made the same finding regardless of the prosecutor's improper question.

Considering that the statement was not highly prejudicial, that curative measures are presumed to have been effective and followed by the jury, and that there is no reason to conclude that the punishment would have been any different, we conclude that the trial court did not abuse its discretion in denying Romero's motion for mistrial.

## Conclusion

We affirm the judgment of the trial court.

 

 

Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish.   TEX. R. APP. P. 47.2(b).