

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00144-CR

_____

JONAS RAY BRADSHAW, Appellant

v.

THE STATE OF TEXAS, Appellee

On Appeal from the 54th District Court
McLennan County, Texas
Trial Court No. 2020-456-C2

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

Jonas Ray Bradshaw pled guilty to seven counts of injury to a child[1] and one count of continuous family violence.[2] Bradshaw agreed to have punishment on those offenses tried to the trial court.[3] On appeal, Bradshaw complains that one of the State's witnesses was allowed to testify to sentencing, specifically to her desire that Bradshaw receive the maximum sentence available. Although this testimony was not admissible, we find the error in admission harmless. We affirm the trial court's judgments.[4]

---

[1]*See* TEX. PENAL CODE ANN. § 22.04 (Supp.). Count one alleged a first-degree felony and counts two through seven alleged third-degree felonies. *See* TEX. PENAL CODE ANN. § 22.04(e), (f). Counts 1, 2, 3, 4, and 5 alleged injuries to C.K. Counts 6 and 7 alleged injuries to J.K. Count 8 alleged injuries against Mother.

[2]*See* TEX. PENAL CODE ANN. § 25.11 (Supp.). This was the only count with a plea-bargain agreement. The State agreed to recommend a sentence of five years for this count. As a result of his plea agreement with the State, Bradshaw had no right to appeal his continuous family violence conviction, which was Count 8 of the indictment. Bradshaw did not attempt to appeal, and this opinion does not address that conviction.

[3]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[4]The trial court sentenced Bradshaw as follows:
        Count 1 – life sentence
        Count 2 – ten years
        Count 3 – ten years
        Count 4 – ten years
        Count 5 – ten years
        Count 6 – ten years
        Count 7 – ten years
        Count 8 - five years
The court ordered the sentences to be served concurrently.

## I. Background

Bradshaw lived with Mother and her two young sons, C.K. and J.K.[5] Over the course of their three-month cohabitation, Bradshaw regularly beat the boys and engaged in violent sexual relations with Mother. Mother acceded to Bradshaw in this regard in hopes of keeping him "happy," "less aggressive," and away from the boys. Bradshaw, himself, would later express his way of thinking to an investigator with the Department of Family and Protective Services: "Why would I have to beat her if I can take it out on her during sex."

On January 5, 2020, Mother took C.K. to an emergency room in Waco after Bradshaw brought C.K., unresponsive, to Mother.[6] C.K. was flown to McLane's Children's Hospital in Temple.

## II. Trial Court Erred to Allow Testimony About Preferred Sentence

The State presented several punishment witnesses. One was Grandmother, who was Mother's mother and the grandmother of C.K. and J.K. Over Bradshaw's objection, Grandmother was allowed to testify that Bradshaw should be sentenced to "whatever the max[imum] punishment that there is." That testimony was inadmissible.

"The wishes of the victim's family members as to the defendant's fate fall beyond the parameters of victim-impact evidence and are not admissible." *Simpson v. State*, 119 S.W.3d 262 272 (Tex. Crim. App. 2003). The trial court erred to allow Grandmother's testimony regarding what punishment she felt was appropriate. We now review this error for harm.

---

[5]We use initials and generic titles for the two child complainants and their immediate family to protect the victims' privacy. *See* TEX. R. APP. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[6]On that date, C.K. was eleven months old and J.K. was about three-and-one half years old.

**III.    Standard of Review**

An erroneous admission of testimony is reviewed for non-constitutional error. *See Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002) ("Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights."); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (stating that erroneous admission of opinion testimony reviewed for non-constitutional error). "A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). "Any . . . error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "In considering non-constitutional error, an appellate court must disregard the error if the court, 'after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003) (quoting *Solomon*, 49 S.W.3d at 365; TEX. R. APP. P. 44.2(b)). In a bench trial, the trial court acts as fact-finder. *See Watson v. State*, 204 S.W.3d 404, 440 n.120 (Tex. Crim. App. 2006) (Cochran, J., dissenting) (plurality op.).

**IV.    Error Was Harmless**

    **A.    Evidence**

The trial court heard two days of punishment evidence. After reviewing that evidence, we conclude that the error[7] in admitting Grandmother's opinion about punishment did not affect Bradshaw's substantial rights and was harmless. *See* TEX. R. APP. P. 44.2(b).

---

[7]On the record of this bench trial, we conduct a harm analysis. *See Gipson v. State*, 844 S.W.2d 738, 741 (Tex. Crim. App. 1992).

Mother met and started dating Bradshaw in August 2019. By October, he had moved in with Mother and the boys. Bradshaw regularly beat the boys, though C.K. received the worst of it.[8] Bradshaw beat C.K. if he cried or did not take his bottle.[9] Mother described some of the abuse: "If [C.K.] wouldn't be a really quiet baby, the way [Bradshaw] wanted him to be quiet, [Bradshaw] would go in there and he would take [C.K.] by his foot and hang him upside down and hit [him] on the wall." If Mother was not sufficiently attentive to Bradshaw, "[h]e would take it out on the kids" by "hold[ing] them underneath the water" at bath time, and "they would be choking, wanting air, and he would pull them out right before they passed out." If the boys struggled or resisted, "[Bradshaw] would slap them and tell them to stop and to behave."

On January 5, 2020, Mother took C.K. to an emergency room in Waco. C.K. was covered "head to toe almost" with bruises of various ages and colors. The hospital staff did not have a cervical collar small enough for the eleven-month-old, and the staff was using their hands to keep the child's spine stable. C.K. had bleeding in his brain and behind his eyes. The staff was very concerned about the extent of C.K.'s injuries. Though generally calm and quiet, C.K. began vomiting, which was consistent with head trauma. C.K. was diagnosed as having suffered a traumatic brain injury. C.K. was sent by Careflight to McLane's Children's Hospital in Temple.

Waco Police Officer Jason Stone investigated C.K.'s injuries and the allegations against Bradshaw. In describing the severity of the beatings C.K. suffered, Stone testified, "[That was]

---

[8]Mother testified, "[J.K]. was the one child [Bradshaw] didn't really bother because [J.K.] had learned to . . . like, *if Jonas is really, really mad I'm going to do exactly what Jonas says*."

[9]Bradshaw admitted to the Department investigator, Olga Solyakova, that he beat C.K. for crying.

5

probably one of the worst beatings that I've ever seen a child take in the time that I've been a peace officer or just a human on this planet."[10]  At the Waco hospital, Bradshaw called Mother, instructing her how to answer questions and what to tell staff and investigators

Crime Scene Technician Marissa Pophann photographed C.K.'s injuries at the Waco hospital.  Of his injuries, Pophann testified,

> In my entire eight years of working at the police department, this is, hands down by far, the worst case of child abuse that I've ever seen.  I have worked multiple cases of murdered children, and they displayed less extensive injuries than the injuries I saw on this child that day.[11]

She observed several cuts on C.K.'s face and fingers and on the inside of his lips.  Pophann also photographed "several bruises and bite marks scattered around [Mother's] body," and she photographed bruising on J.K.'s right leg and buttocks.[12]

Solyakova interviewed Bradshaw.  Bradshaw admitted that he beat J.K., and that he hit and bit C.K.[13]   During the interview, Bradshaw said he was "where he belong[ed]."  The interview was conducted in the McClennan County Jail.  Bradshaw was in jail from January 5, 2020, until trial, September 12 and 13, 2022.  The jail supervisor described Bradshaw's attitude toward incarceration as "nonchalant."  According to the supervisor, Bradshaw acted as though

---

[10]Stone participated in the interview of Bradshaw.  Bradshaw never used C.K.'s name.  Rather, he referred to the infant as "the little f*cker."  During the almost two-hour interview, Bradshaw never asked about C.K.'s condition or well-being.

[11]Describing the reactions of other law enforcement officers who saw C.K. at the hospital, Pophann said, "Everybody who came into contact with the child appeared very shocked and shaken.  Multiple grown men and women with tears in their eyes.  Just an overall very shocking, taken aback reaction."

[12]At the family home, Pophann observed and photographed a chain lock on the outside of the door to the master bedroom and evidence that a chain lock had been installed then removed on the door outside the children's playroom.  The electricity to the playroom was also turned off at the breaker box.

[13]Solyakova also testified that Bradshaw never referred to C.K. by his name, instead calling him "the kid."

the jail's rules did not apply to him, and he had to constantly be moved to different pod areas because he would incite insubordination and misbehavior among other inmates.

Dr. Erica Ward, a pediatrician at McLane's Children's Hospital, examined C.K. after he was flown to the hospital in Temple. She described C.K.'s extensive injuries, which included the following:

- diffused facial bruising and abrasions;

- bruising and petechiae on his gums and upper frenulum;

- bruising on both shoulders, with pattern bruising on the left shoulder;[14]

- bruising of abdomen, right ear,[15] and both eyes;

- bilateral subdural hematomas;

- "Bilateral multiple intraretinal hemorrhages"; and

- exhibited "[a]ltered mental status" – "was not alert and responsive."

C.K.'s injuries were not consistent with those a child would incur, even if he had a "big fall."[16] He had "a large abrasion where the skin ha[d] been compromised on the side of his face," which could possibly have been a burn injury. Regardless, that injury was uncommon; it was "clearly trauma to the face" and without any "clear history" for explanation. Dr. Ward testified that the multiple facial injuries C.K. exhibited were not "commonly see[n] . . . all throughout the face

---

[14]Treatment notes stated that C.K.'s right shoulder popped with movement.

[15]Dr. Ward said bruising of the ears was "very rare," as ears tend to be "very protected."

[16]Bradshaw initially told law enforcement that C.K. had fallen down the home's stairs and hit his head on the tile floor.

with normal play at [C.K.'] age."[17] She called C.K.'s retinal hemorrhages "very severe" and "very rare."

By the time of trial, C.K. was about three years, eight months old and nonverbal. In cognitive testing a year before trial, C.K. exhibited the intellectual capability of an eight-month old.[18] Grandmother testified that he could only say "G," as if trying to say "Gigi," his affectionate name for her. After C.K. was released from the children's hospital, the boys stayed with their grandparents. It took some time for the boys to resume eating, and it was difficult to find things they would eat. Grandmother testified that C.K. would only eat cardboard for almost a year,[19] then was able to eat formula with baby cereal. C.K. was very violent, banging his head and biting people. He cried continuously and had difficulty sleeping. Bathing the boys was almost impossible; they would not tolerate water on their faces or heads. Eventually the grandparents were able to bathe the children by pretending bathing was swimming.

As explained above, Grandmother was allowed to testify over Bradshaw's objection that she thought Bradshaw deserved "whatever the max[imum] punishment" available. Without

---

[17]The treatment notes with annotations around the diagram of an infant's body indicate "totality of facial injuries over majority of surface area."

[18]C.K. was diagnosed with autism in July 2022, about two months before trial. The State presented testimony from an occupational therapist who worked with C.K. for about a year, beginning about two months after his hospitalization in January 2020. The therapist testified to significant developmental delays C.K. exhibited in several categories such as gross and fine motor skills and cognition. However, she could not testify that, if C.K. suffered a traumatic brain injury from Bradshaw's beatings, that injury caused the developmental delays. She did testify, though, that she had observed "small improvements, very minor improvements, but not at the rate [she] would have liked to see" and that she had encountered with other children.

[19]Grandmother testified, "He would only eat like cardboard. I don't know why, just cardboard. He loved cardboard."

8

objection, Mother testified that she wanted "justice" and "the harshest punishment" the trial court could assess.[20]

### B. Analysis

The prejudicial effect, here, of allowing Grandmother's opinion of the appropriate sentence for Bradshaw, did not affect Bradshaw's substantial rights. The record is replete with descriptions of the injuries to C.K. and to J.K. The injuries to C.K. quite reasonably could have led to the maximum sentences in counts one, two, three, four, and five. While the evidence was not as exhaustive on the injuries to J.K., Bradshaw's cruelty and violence toward C.K. could reasonably have informed the trial court's decision to assess the maximum sentences for counts six and seven for the injuries to J.K.[21]

---

[20]The State argues that Mother's testimony was essentially the same as Grandmother's, and Bradshaw's failure to object to Mother's testimony cured the erroneous admission of Grandmother's testimony. However, the cases establishing that proposition address the admission of factual evidence. *E.g.*, *Lane v. State*, 151 S.W.3d 188, 192–93 (Tex. Crim. App. 2004) (victim's out-of-court identification of defendant not objected to when admitted under medical diagnosis hearsay exception but admitted over excited-utterance objection); *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) (failure to object second time witness testified he feared for his life by appearing to testify against defendant); *Rodriguez v. State*, 630 S.W.3d 522, 527 (Tex. App.—Waco 2021, no pet.) (failure to object when detective related a second hearsay statement that another person told the detective a suspect was in the house).

Here, it was not a fact that was proved by objected-to and unobjected-to testimony but, rather, opinions as to punishment by two different witnesses. *Cf. Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same *fact* that the inadmissible evidence sought to prove." (emphasis added)); *Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. [Panel Op.] 1978) ("[T]he improper admission of evidence does not constitute reversible error if the same *facts* are shown by other evidence which is not challenged." (emphasis added)). Under the facts of this case, we will consider the unobjected-to testimony of Mother in our harm analysis.

[21]*See* Tex. Code Crim. Proc. Ann. art. 37.07(a)(1) (Supp.) (stating that prior criminal record, evidence of other extraneous crimes or bad acts, *inter alia*, may be considered in setting punishment).

## V. Conclusion

We find that none of Bradshaw's substantial rights were affected by the erroneous admission of Grandmother's opinion on punishment. Because the error was harmless, we overrule Bradshaw's point of error.

We affirm the trial court's judgments.

Jeff Rambin
Justice

Date Submitted:     May 8, 2023
Date Decided:       June 30, 2023

Do Not Publish

10